David CIRILO et al., Appellants,

v.

COOK PAINT AND VARNISH COMPANY et al., Appellees.

No. 15815.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Jan. 13, 1972.

Rehearing Denied Feb. 10, 1972.

Mandell & Wright, Arthur J. Mandell, Houston, for appellants.

Fulbright, Crooker & Jaworski, Charles D. Boston, Frank G. Jones, Houston, for appellee.

Jimmie F. Y. Lee, Houston, for intervenor.

PEDEN, Justice.

Personal injury suit brought against manufacturer and retailer of a new aluminum ladder which was found to be bent after David Cirilo fell while using it. This appeal is based on the trial court's rulings on admissibility of evidence and on questioning and argument by appellees' counsel.

Plaintiffs' theory is that the ladder buckled while Cirilo was on it, and defendants contend that its upper end slipped off

the light fixture against which it was propped and that it buckled under Cirilo's weight when it struck a small bus parked nearby.

Trial was to a jury. It answered "We do not" to Special Issue No. 1, which asked whether the ladder buckled while Cirilo was on it while it was resting against the light fixture. Plaintiffs' remaining liability issues were predicated on an affirmative finding to the first issue, so the jury was not required to answer them.

Appellants' first point of error was "The trial court erred in refusing to permit plaintiff to introduce in evidence the contradictory statement given by defendants' chief witness, House."

We review the deposition testimony of John L. House, taken August 30, 1969. It was offered by the defendants. He testified that he was a sergeant in the U.S. Army, and was on leave when he happened to be at the Coopers' Enco Station on Gregg St. in April, 1967 on the day an accident occurred. He knew the Coopers and had voluntarily helped around the station. He was visiting there that day. The men who were there to do some painting were eating lunch when he first saw them around noon. He saw the man later involved in the accident get paint from a truck and move to the Enco sign located at the corner of Gregg and Bear. The sign was supported by a steel pole. One end of a neon light fixture was attached to the top center of the sign by a connection joint. The fixture was perpendicular to the sign. He saw the man position the ladder on the light fixture attached to the sign, but did not see him climb the ladder.

House was standing in front of the station between the door and the pumps and was not occupied. It was a normal, sunny day. There was nothing between him and the Enco sign, and he could see the top of it. When he first saw the painter on the ladder, the top of the ladder was resting against the light arm above the Enco sign, the bottom of the ladder was pointing away from Gregg St. and the painter was standing about halfway up the ladder. He was in front of the sign and far enough up the ladder that he could reach the light on which the ladder was resting. He was facing the light fixture and the sign was to his right. House saw him reach up toward the top of the sign, then House looked away. He looked back when he heard a skidding sound and a yell. The ladder and the man were "en route to falling." When he looked around, the ladder was just to the top of a small school bus that was parked on the other side of the sign pole. He saw the ladder just before it hit the bus and as it did so. The painter had "completely come unattached" from the ladder and was falling backwards, coming to a sitting position. His body struck the ladder, about the same time the ladder came in contact with the bus, approximately halfway between the bus and the ground. House did not see any bend or dent in the ladder before it struck the bus. After the painter hit the ladder and the ladder hit the bus, he fell to the ground on his left side. At this time the ladder was bent. Its top was on the top of the bus and its bottom was on the ground.

House first saw the man on the ladder two or three minutes before he fell. There were no customers for House to wait on, but he wasn't watching the painter all of the time. House's memory of the events would have been fresher a day or so after the accident than when his deposition was taken, some two and a half years later. The ladder struck the bus but the man did not.

We omit a review of the testimony concerning the direction of the bus from the pole, etc. House admitted having given a statement shortly after the accident. He said he saw nothing wrong about the way the painter went about his work. House was a high school graduate in 1967.

The following then appears in the statement of facts (appellees' counsel was still reading from House's deposition, the ques-

tions having been asked by appellants' counsel):

"QUESTION: What· do the words, 'I am working temporarily at the Cooper Humble Service Station located at 616 Gregg Street, Houston, Texas,' mean to you?

"ANSWER: I was working not in the form of a job. However, if someone came, since Mrs. Cooper was there, rather than her go out and wash the windshields or serve the car, I would do it myself.

"QUESTION: I thought I asked you before, and I thought we agreed when you say, 'I am working,' to you it means something different than 'I am just hanging around and helping out from time to time.'

"ANSWER: It would mean differently, according to the term. However, I was working, physically working, without any pay.

"QUESTION: What does this language mean to you: 'At that time I was servicing a customer's car, putting gas in his tank'? That is pretty clear what it means, isn't it?

"ANSWER: Yes, sir, it is.

"QUESTION: Couldn't possibly be any misapprehension or misunderstanding when somebody says: 'At that time I was servicing a customer's car, putting gas in his tank.' If that's what you did you couldn't be mistaken about that, could you, if that's what you did?

"ANSWER: If that's what I did, no, I could not be mistaken.

"QUESTION: And you had no reason the day after this accident to say anything but what you remembered to have taken place?

"ANSWER: Right.

"QUESTION: You had no reason, did you?

"ANSWER: I had no reason.

"QUESTION: 'I had my back turned to the painter at the sign, since I was facing south.' Now, that's plain language, isn't it?

"ANSWER: Yes, sir, it is.

"MR. BOSTON: Counsel, we'll object to your apparent reading from some instrument without showing the witness what you are reading from, or what language—

"MR. MANDELL: I will show it to him in due time, I just want to see whether he understands it.

"QUESTION: Now, there is nothing mysterious about that language, is there, it's clear?

"ANSWER: It's clear, yes, sir.

"QUESTION: 'Suddenly, I heard the painter at the sign start hollering.' Now, there is nothing mysterious about that, is there, that's simple language, isn't it?

"ANSWER: Yes, sir, it is.

"QUESTION: Now, is there anything strange about the language that reads something like this: 'There was a small yellow school bus facing north and just to the east of the sign.' Is that language strange to you, or is it clear?

"ANSWER: It's clear.

"QUESTION: 'When I heard the painter yell I looked and noticed him falling down.' That's clear, isn't it?

"ANSWER: Yes, sir.

"QUESTION: 'As he was falling I noticed that he was falling face down.' That's clear language, isn't it?

"ANSWER: Yes, sir.

"QUESTION: I mean, nobody can be mistaken by saying he fell backwards when he fell face down? That's clear, isn't it, he either had to be one way or the other?

"ANSWER: Right, sir.

"QUESTION: 'He fell on the west side of the bus.' That's clear language, isn't it?

"ANSWER: Yes, sir.

"One thing I would like to point out here, on directions, I have been informed of the directions, I do not, and I never have known the actual direction of that area.

"QUESTION: But, Sergeant, you are an intelligent man, you appear to be, and I am sure you are, my question to you was whether that language is clear.

"ANSWER: The language, yes, sir, is clear.

"QUESTION: That's all. 'I do not know whether the ladder was falling with the man, or not.' That language is clear?

"ANSWER: Yes, sir.

"QUESTION: 'I turned off the gas pump. . . .' That language is clear?

"ANSWER: Yes, sir.

"QUESTION: Now, you had no reason in the world, the day after this accident happened, to tell somebody that you turned off the gas pump unless this is what you felt happened, if you made that statement?

"ANSWER: Yes, sir.

"QUESTION: Then this language: 'I do not actually know if the ladder hit the bus on the way down.' Is that language clear?

"ANSWER: It's clear, yes, sir.

"QUESTION: There was no reason on earth for you to have told anything different what you remember the facts have been on that date? Was there any reason for you not to tell the truth, just like you knew it?

"ANSWER: No, there was no reason.

"QUESTION: '. . . nor do I know how far up the ladder he was when he started falling.' Is there anything strange about that language?

"ANSWER: No, sir, it's not.

"QUESTION: If, in fact, you knew how far up he was you would have said so, there was no reason for you not to say so, was there?

"ANSWER: No, sir, there wasn't.

"MR. MANDELL: Let the record show I have showed the statement to counsel.

"MR. BOSTON: Are you going to present this to the witness?

"MR. MANDELL: Sure.

"QUESTION: Is that your signature, sir?

"ANSWER: Right, it is.

"QUESTION: You remember giving this statement, now that you see it?

"ANSWER: I remember prior that I had given a statement.

"QUESTION: You remember the date of this?

"ANSWER: I see the date.

"QUESTION: April 7.

"ANSWER: Yes, sir, it is.

"QUESTION: So the accident happened on April 6, this was just a day after?

"ANSWER: Yes, sir.

"QUESTION: There was nothing wrong with your memory then, was there?

"ANSWER: No, sir, there was nothing wrong with my memory.

"QUESTION: And you had no reason on earth not to tell the facts as you knew them to be?

"ANSWER: No, sir, I did not.

"QUESTION: And I suppose you did that?

"ANSWER: I did tell the truth. Now, you—

"QUESTION: And you are—"

(Colloquy omitted.)

"QUESTION: Excuse me, go ahead.

"ANSWER: This statement was given, as I stated I don't know the date, but the situation I remember now, as I remember the situation then. As I stated before, the directions in relation to the statement and the directions in which the actual situation occurred are different. For example, as you stated, to agree with you, as a relation, as a reference point, that the freeway was north of the station, the same incident as the relation of this case, the directions I did not know, therefore, it was an agreement that the direction would be as this for a relation point, there was no actual direction established by myself that this is north or this is east. The location of the bus I am positive of, and it was between the sign and Gregg Street. And reference to your directions it would make it west, I believe, of the sign, itself.

"QUESTION: Well, sir, excuse me, I don't mean to stop you. If you have anything else to say go ahead.

"ANSWER: I was not servicing any automobile, there was not any customers present that I was involved with. There were only the painters, myself, Mrs. Cooper, and anyone else—

"QUESTION: Have you read the statement over?

"ANSWER: No, sir, I have not read this one.

"(Discussion off the record.)

"QUESTION: Have you read the statement now, sir?

"ANSWER: Yes, sir. Some facts I would like to clear up about the statement.

"QUESTION: Well, I just asked you, have you read the statement?

"ANSWER: Yes, sir, I have.

"QUESTION: Now, then, can you point out anything in the statement which contains language that you don't understand?

"ANSWER: No, sir.

"QUESTION: Would you read the last line, in your own handwriting, what I'm pointing to right now?

"ANSWER: 'I have read this.'

"QUESTION: You wrote that in your own handwriting, didn't you?

"ANSWER: Yes, sir.

"QUESTION: I suppose that was true?

"ANSWER: It should have been, yes, sir.

"QUESTION: And this statement, if the accident happened during the noon hour, or shortly after noon on April 6, was given at least within 30 hours after the accident happened, if it was given on the 7th?

"ANSWER: Could have been more."

The statement of facts shows that appellants' counsel later read to the jury part of House's deposition testimony (previously read by appellees' counsel, as we have seen) beginning with the question:

"Now is there anything strange about the language that reads something like this: 'There was a small yellow school bus facing north and just to the east of the sign.' Is that language strange to you, or is it clear?"

The testimony offered by appellants on this matter ended at the same point as that we have quoted as having been tendered by appellees.

At that point appellants offered in evidence what is now identified as their Exhibit No. 13. Appellees objected that it was hearsay and stated that the portions used on examination had been read. The

trial court ruled that the statement could be used as impeachment, and that this had been done, but that the statement itself could not be introduced.

Permission was then asked to read the statement to the jury. Appellees objected that the statement had already been read to the jury piecemeal and objected to any further reading as being hearsay. The objection was sustained.

This statement constituted the exhibit:

Houston, Texas
April 7, 1967

"STATEMENT OF JOHN L. HOUSE:

"My name is John L. House, I am 25 years of age, single, and I reside at 518 Gregg Street, Houston, Texas. I am working temporarily at the Cooper Humble Service Station located at 616 Gregg St., Houston, Texas. I am in the Army, and am Sergeatn E5, serial number RA 18689797. I am transferring from Germany, and am on my way to Korea.

"On April 6, 1967, right around 1:00 PM, while I was working at the Cooper Humble Serv. Station, located at 616 Gregg Street, an accident occured, the details of which I know, are as follows:

"On the above date and time, three painters drove up in a pick-up truck just before lunch. They ate their lunch at the station, and then got ready to paint the signs AND xxxx traffic island poles. One of the painters had just set his ladder up against the sign, located at the north-west corner of the drive-way. At that time, I was servicing a customer's car, putting gas in his tank. I had my back turned to the painter at the sign, since I was facing south. Suddenly I heard the painter at the sign start hollering. He had the ladder xxxxxx up against the *sing*, at an angle, on the west side. The top of the ladder was up to the neon lights on top of the sign. There was a small yellow school bus fac-

ing xx north, and just to the east of the sign. When I heard the painter yell, I looked, and noticed him *faling* down. As he was falling, I noticed that he was falling face down. He fell on the west side of the bus. I do not know whether the ladder was falling with the man or not. I turned off the gas pump, and ran over to where this man was. He was lying on his left side, with his head facing west. I noticed that the ladder had fal *lne* down, with the base of the ladder near the sig, and the top of it toward the street, or to the east. When I got to the man that had fallen, he was unconcious, and blood and food was coming out of his mouth. This injured man remained unconcious until an ambulance came to take him to a hospital. I noticed that there was a sharp bend in the top portion of the ladder. This was an aluminum ladder. I do not actual ly know if the ladder hit the bus on the way down. Neither do I know if the man hit the bus before he landed on the ground.

"I had not noticed the man placing the ladder against the sign; before the accident, nor do I know how far up the ladder he was when he started falling. I just heard him yell, looked around, and saw him in the process of _alling. I do not know the name of the injured man, nor the names of the other xx painters. I do not know how tall the ladder was, but it extended from the ground to the neon lights on top of the sign.

"I have read this        /s/ John L. House

   I have read this         John L. House"

■■■ The general theory of impeachment by proof of a prior inconsistent statement by the same witness is to show that he has a capacity for making errors. From his error on one point it may be inferred that he has erred on other matters. Since his previous statement and his present testimony are contradictory, one of them must be erroneous. Therefore he has made an error, but the inference to be drawn is indefinite, i. e., merely a capacity

to make errors. Where he denies making the former statement, other witnesses must be called. 1 McCormick & Ray, Texas Law of Evidence (2nd Ed.) 531, § 687.

"Where the witness denies making the prior contradictory statement all the courts hold that the adverse party may prove that he did make such statement. And where he states that he 'does not remember' having made the statement or is not positive he made it, the predicate is complete and the impeachment may proceed. But suppose the witness unqualifiedly admits making the statement. Does this exclude further proof by the adverse party? The Texas Courts have consistently held that it does. This view has been criticised and it may be partly based on the erroneous notion that the thing sought to be contradicted is the answer of the witness to the preliminary question. In fact, the thing sought to be contradicted is some previous assertion he has made on the stand. To do this it is desired to prove an opposite statement made at some prior time. Proof by the witness' own admission adequately accomplishes the purpose, and further proof by another witness while more emphatic, is wasteful of time." op. cit., 543–544, § 695.

"Subject to the exception, in criminal cases, relative to the showing of bias, it is prerequisite of the right to introduce independent impeaching testimony that the witness should have denied, or, at least, have refused to admit unqualifiedly, the existence of the impeaching matter. By asking an impeaching question the cross-examiner injects a new issue into the case, and orderly procedure requires that the witness should be asked about it while on the stand, for the twofold purpose of making independent evidence thereof unnecessary if the witness should admit the truth of the impeaching matter and of giving him the opportunity to explain, if he can, the matter tending to his discredit." 62 Tex.Jur.2d 180, Witnesses § 234.

"In accordance with the general rule, where the witness has answered on cross-examination that he did make the former statement imputed to him, further evidence as to that statement is not admissible, even if it is contained in a writing, for the cross-examiner has already brought out the full impeaching value of the inconsistent statement, and to allow further proof of it would be to over-emphasize the statement as discrediting matter, especially after the witness has explained the circumstances, and would unduly prolong the trial. What the witness did say is then an admitted fact, no longer an issue, and therefore not requiring any corroborative testimony.

"However, the cross-examination as to the discrediting matter is not terminated immediately when the witness has admitted the authorship of the writing referred to by counsel. The document may thereafter be used by quoting pertinent excerpts and questioning the witness about the statements therein as contrasted with his testimony. On the other hand, where the witness has admitted that he made a contradictory statement, and has proferred a satisfactory reason for making it, a question pressing him to admit that he was not then telling the truth may be disallowed, for it is for the jury to determine whether, in view of the explanation, the contradictory statement should be deemed to discredit the witness." op. cit., 311–313, Witnesses § 309.

The plaintiffs were entitled to show that the prior written statement, which the witness admitted having made, was indeed inconsistent with his deposition testimony. In most of its important aspects it was inconsistent with his later account, so we would allow the inconsistencies to be divulged by showing the statement to him, and, if he admitted having signed it, by tendering it as contradictory matter, giving him an opportunity to ex-

plain the inconsistencies. Forbes v. Hejkal, 271 S.W.2d 435 (Tex.Civ.App.1954, writ dism.).

Here the appellants took a different approach. In taking the witness' deposition they asked whether the wording of each inconsistent prior statement was clear. It is apparent in the record that the witness admitted having signed the statement and that its contents were being read to him.

The narrow question before us is whether the trial judge abused his discretion in refusing to admit the statement in evidence after testimony had twice been introduced as to its contents. We hold that since the evidentiary substance of the statement had been revealed by the oral testimony of the witness, the trial court did not err in excluding the statement. See also Employers Liability Assur. Corp. v. Groninger & King, 299 S.W.2d 175 (Tex.Civ.App.1956, writ ref. n. r. e.) and Texarkana Gas & Electric Co. v. Lanier, 59 Tex.Civ.App. 198, 126 S.W. 67 (1910, no writ).

Appellants' second point of error states that the trial court erred in admitting over their objection testimony of the witness House as to how the light fixture in question was connected to the pole.

When House's deposition testimony was offered in evidence by appellees, the following is shown in the record:

"QUESTION: How was the end of the light fixture attached to the light pole, if you know?"

"ANSWER: It was attached by a U joint.

"QUESTION: And what do you mean by a U joint?

"ANSWER: Similar to the connections of the two-inch water pipe joint that was connected to the top of the light fixture and also to the end of the sign.

"QUESTION: Well, what kind of support arm was there attaching the light fixture to the top of the light pole, or the top of the sign?

"MR. MANDELL: If it please the Court, we object to this next question because in the answer given by the witness he begins with 'In my opinion,' and no evidence has been shown to show that he is qualified to give an opinion; secondly, beginning on page 80, the evidence shows that this man did not observe the connection of that sign until some time prior to 1964 and he testified that he knew nothing about the condition of the connection of the sign prior to 1964 through April 6, 1967.

"THE COURT: All right. I overrule the objection.

"MR. MANDELL: Note our exception.

"MR. BOSTON: Continuing at line 23, page 40:

"ANSWER: In my opinion, a two-inch water pipe joint, and also two connections between the end of the sign that screwed into the end of the joint and another section of water pipe that came from the top of the sign into the other end of the joint.

"QUESTION: Had you ever had occasion to be up on the sign or near the sign prior to this accident?

"MR. MANDELL: Object to this question because it doesn't show when he was up there in period of time. The evidence, on the contrary, showed it was prior to 1964.

"THE COURT: I overrule the objection.

"MR. MANDELL: Note our exception.

"MR. BOSTON: Continuing with line 6 on page 41:

"ANSWER: Yes, sir, I had.

"QUESTION: And why had you been there, and when was that?

"MR. MANDELL: I have the same objection to the next question, Your Honor.

"THE COURT: Yes, sir. It is overruled.

"MR. BOSTON: Beginning at line 8, page 41:

"ANSWER: When I cannot say, however, I had been there for the purpose of attaching the Big Bonus sign.

"MR. MANDELL: The big what?

"THE WITNESS: Big Bonus signs and the flags. I don't know the exact classification of the flag, however they are the red, white and blue flags that would be normally flying in front of the stations. I had attached these to the sign prior."

Later the record reflects:

"QUESTION: Do you remember when you put out those colored signs, you know, which you were telling us about, I forgot what you call—those stringers that you put up? When was it?

"ANSWER: I put them up before entering the service, the exact time I can't state.

"QUESTION: And you entered the service in '64?

"ANSWER: '64, yes, sir.

"QUESTION: You have no idea what has been done to that particular connection since then?

"ANSWER: No, sir.

"MR. MANDELL: May it please the Court, in view of this testimony, I ask that the testimony by this witness about how that light was connected and what kind of connection it had be stricken because, obviously, he doesn't know anything about it, as to what

happened between 1964 or prior to 1964, until April 6, 1967.

"THE COURT: Overrule the objection."

Appellants contend that the trial court erred in admitting House's testimony on this point because it was his unqualified opinion on what he observed more than three years prior to the accident, and appellees offered no evidence showing that nothing was done to those connections in the intervening time or that they were in substantially the same condition.

■ We overrule this point. House's testimony did not amount to expression of an opinion on the matter in issue: whether or not the light fixture was unstable. The trial court was entitled to conclude that his use of the phrase "in my opinion" was another way of saying "I believe" or "as I recall."

" . . . Of course the form of the expression is not controlling as to the statement's admissibility. What purports to be a direct statement of fact may in reality be a mere deduction. Conversely, a statement in the form of a ratiocinative opinion may be a statement of fact within the knowledge of the witness. Thus, where it appears that a witness is testifying to facts from his own observation but that his observation was uncertain, or his recollection is unclear he may qualify his testimony by the use of such phrases as 'I believe,' 'I think,' 'It is my impression,' without detracting from its admissibility." 2 McCormick & Ray, Texas Law of Evidence (2nd Ed.) 229, § 1398.

■ The jury could judge, from photographs introduced in evidence by both appellants and appellees, whether the connection between the fixture and the sign appeared to have been appreciably changed.

The trial judge did not abuse his discretion in admitting House's observation as to the construction of the connection. It was

**752**

not made at a time so remote as to render it irrelevant. The connection was about nineteen feet above the ground, and its construction would not be expected to have been changed in the intervening period of three years or so.

■ Appellants' next point of error complains that defendants' counsel improperly questioned a witness, Mr. Brimberry, regarding workmen's compensation insurance.

The appellants called as their witness Mr. Brimberry, who was business manager of the painters' union local to which Mr. Cirilo belonged. He testified on direct examination that Mr. Cirilo had not worked as a painter with the union long enough to qualify for a pension even though totally disabled. On cross-examination his testimony was:

"QUESTION: Prior to 1967, before June of 1967, if you had a man disabled he was not entitled to any kind of pension or any disabilities?

"ANSWER: The only thing that we had—we have had now for some time our health and welfare. Now, that is our insurance that we take out, health and welfare insurance.

"QUESTION: Now, that was applicable at the time of David's accident?

"ANSWER: That was before. There have been different insurance conditions which would pay $35.00 a week if they was hurt off the job, but if it was where workmen's compensation was involved, they would get $35.00 a week if they was hurt off the job site. Now, that was in effect. We have changed insurance companies and we have Pan American right now, but we do have $35.00 a week right now.

"QUESTION: So at the time the accident happened, if you were hurt on the job or hurt off the job you were paid $35.00 a week by one insurance program or the other?

"ANSWER: No. If you was hurt on the job you never get anything.

"QUESTION: Well, you get your workmen's compensation?

"ANSWER: That would be workmen's compensation, yes."

It was Mr. Brimberry who first brought up the matter of workmen's compensation insurance, then incorrectly stated that if hurt on the job, a member got nothing. Although the trial court had granted appellants' motion in limine that there be no mention of workmen's compensation benefits without prior approval of the court, we hold that under the evidence in this case the trial court did not err in refusing to grant appellants' motion for new trial based on the testimony on this matter, appellants having opened up the matter of collateral source payments, the witness having first mentioned workmen's compensation benefits and incorrectly stated that a man who was injured on the job never got anything, the appellees were entitled to correct this misstatement.

■ Appellants' last point of error is that the trial court erred in failing to grant plaintiffs a new trial because of the improper and prejudicial argument by defendants' counsel advising the jury of the effect of their answers to the special issues.

Although we do not find in the record the argument complained about, appellees do not challenge the statement made in appellants' original brief as to its content. As authorized by Rule 419, Texas Rules of Civil Procedure, we accept as correct this quotation from appellants' brief as to what appellees' counsel stated to the jury in arguing as to damages:

"Now, David Cirilo had a serious injury . . .

"Now, if the question were based on what amount of money do you think he

ought to have because he fell, just because he fell, I would say the $50,000 would be reasonable. If the question was what amount of money do you think he ought to have if the ladder was defective, then I would say, 'Well, none,' because the ladder wasn't defective. This is not a case where he is to be awarded money because it fell; this is a case where the only liability of the defendants would relate to a finding that the ladder was somehow deficient or defective."

It is the last sentence of the argument that appellants say is particularly prejudicial. The damage issue, to which the jury answered "none," was not tied by predication or in any other manner to any liability finding. The appellants point out that the crucial issue in the case was whether the ladder was reasonably fit for its intended use.

As we have noticed, however, the jury answered "We do not" to the first special issue and thus did not reach the second issue, which asked if the ladder was not reasonably fit for its intended use. Nor did the jury reach any other issue upon which liability of the defendants might have been based.

We do not believe that the argument in question had the effect of informing the jury of the effect of its answers. There was only one series of issues concerning liability of the defendants and one series of damage issues. We think it must have been obvious to the jurors that if the ladder didn't buckle under Cirilo's weight and if it was not found that the ladder was unfit for its intended use, the appellants could not recover. Also, that if the jury answered "none" to the damage issue, there would be no recovery.

Further, we cannot tell whether the argument was invited, because we do not have before us the record of the previous argument.

Affirmed.