**Lushion KIRTLEY, Appellant,**

v.

**Bobbie KIRTLEY, Appellee.**

**No. 7844.**

Court of Civil Appeals of Texas.

Texarkana.

July 11, 1967.

Rehearing Denied Aug. 8, 1967.

Henry J. Novak, Jr., Emmett Colvin, Jr., F. T. Gauen, Dallas, for appellant.

Yale B. Griffis, Dallas, for appellee.

FANNING, Justice.

The questions involved on this appeal relate to the issue of property adjudication. The divorce granted appellee was not appealed from. Appellant has appealed from the property adjudication feature of the riage.

The parties were married on June 15, 1947; this marriage was terminated by divorce decree dated October 10, 1966. Appellant owned two lots and houses on Peachtree Road in Balch Springs, Texas, and a rifle and a shotgun, prior to his marriage to appellee, and these items were adjudicated by the trial court as the separate property of appellant and awarded to him as such.

A number of parcels of real estate, consisting of houses and lots, were acquired during the marriage. Also certain personal properties were acquired during the marriage.

Appellant testified and contended to the effect that through the years 1948–1959, he purchased eleven pieces of the real estate involved herein from $35,000.00 cash which he acquired by gift from his grandfather prior to his marriage.

The trial court submitted three special issues to a jury. Issues 1 and 2 were not answered. Issue No. 3 was answered "No". We quote from the transcript in this regard as follows:

"SPECIAL ISSUE 1

"Do you find from a preponderance of the evidence that J. L. Kirtley, deceased, during his lifetime gave Lushion Kirtley the sum of $35,000.00 cash?

ANSWER: 'Yes' or 'No'.

ANSWER: ———

"If you have answered the above special issue 'yes', then you will answer the following Special Issue, otherwise do not answer the same.

"SPECIAL ISSUE 2

"Do you find from a preponderance of the evidence that Lushion Kirtley comingled these funds with other community funds?

ANSWER: 'Yes' or 'No'.

ANSWER: ———

"SPECIAL ISSUE 3

"Do you find from a preponderance of the evidence the defendant, Lushion Kirtley, purchased the items of real property, other than the property on Gaylord Street and Transit Street, with his personal funds, that is with funds accumulat-

ed before his marriage or funds acquired after his marriage through a gift?

"ANSWER: 'Yes' or 'No'.

"ANSWER: 'No'."

The trial court held to the effect that the eleven pieces of real estate in controversy were community property and awarded six of the eleven pieces of real property in question to appellee, and the other five to the appellant, and the trial court also adjudicated with respect to the partition of the remaining community property. Also as hereinbefore stated the trial court awarded the two pieces of real estate on Peachtree Road in Balch Springs, Texas, and a rifle and shotgun, to appellant as his separate property.

Appellant presents three points on appeal, wherein he contends to the effect that the verdict of the jury is contrary to the facts, etc., that the trial court erred in not granting a mistrial by reason of appellant's counsel injecting certain harmful hearsay statements relating to a material issue, and that the trial court erred in commenting on the weight of the evidence in a manner highly prejudicial to the appellant.

Appellant's testimony with respect to the alleged $35,000.00 cash gift from his grandfather prior to his marriage was briefly as follows: That about the spring of 1946, his grandfather, J. L. Kirtley, (now deceased), who lived near Sulphur Springs, Texas, who was then about 78 years of age, gave him $35,000.00 cash in a sack, and that he buried this money in a metal box on his home property in Dallas and re-buried it at times when he moved; that when he wanted to get money to buy the properties in question he would dig up the metal box, get the cash out of it, and would pay for the property in cash; he testified that he bought the eleven pieces of property in question from this cash hoard. We quote from the re-cross-examination of Mr. Kirtley in part as follows:

"Q. Mr. Kirtley, I understand that from your testimony on direct examination that you say your grandfather gave you $35,000.00 in liquid cash, is that your testimony sir?

A. Yes, sir.

Q. And he gave it to you in 1946?

A. Yes, sir.

* * * * * *

Q. What other estate did your grandfather have? You were there every weekend you say. What other estate did your grandfather have at that time when he gave you the $35,000.00?

A. He had nothing else that I knew of at that time, other than these farms—

Q. Well, how many farms did he have at that time, Mr. Kirtley?

A. At the time he gave me the money?

Q. Yes, sir.

A. I don't know that he had any.

* * * * * *

Q. How do you account for the fact, Mr. Kirtley, that the instrument here that has been introduced in evidence shows an infinitesimal part of the evaluation of this man's estate less than a year later? (Note. The instrument referred to was the inventory and appraisement of the Estate of J. L. Kirtley, deceased).

A. I understand he gave everything away before he died.

* * * * * *

Q. And your testimony is before you married Mrs. Kirtley, your grandfather had given you $35,000 in liquid cash?

A. Yes, sir.

Q. And now, what other children—how many grandchildren did Mr. J. L. Kirtley have other than you?

A. I don't know exactly, but he had several.

Q. He had about 18, didn't he?

A. I would say so.

Q. And he had about 18 other grandchildren, other than you. Can you think of one grandchild he ever gave any other money to other than yourself?

A. I wouldn't know.

\*   \*   \*   \*   \*   \*

Q. Now, where were you when Mr. J. L. Kirtley gave you this $35,000 in cash?

A. I was there at his home visiting.

Q. And what did he say to you before he gave you this money?

A. Best I can remember, he said 'I am going to give you something.'

Q. What did he do then, when he said, 'I am going to give you something'?

A. Handed me the sack.

Q. He handed you the sack. Did you open the sack at that time?

A. No, sir.

Q. When was the first time that you opened that sack?

A. I don't recall exactly, seems like I waited till I got home.

Q. Do you mean till you got back to Dallas?

A. Yes, sir.

\*   \*   \*   \*   \*   \*

Q. What denominations was this money in?

A. It was in $500.00 and $100.00 bills.

Q. Which was most, more $500.00 or more $100.00s?

A. Seems to me like there was more $100.00 bills.

Q. Did you say anything to anybody about this money?

A. No, sir.

Q. Never told anybody about it?

A. No, sir.

Q. Are you sure?

A. My uncle—and before I left Sulphur Springs I showed it to him and two other fellows, but I don't remember who the other fellows were. But I did show it to him.

Q. You did show him the money?

A. Yes, sir.

Q. Did you take it out of the sack?

A. No, sir.

Q. You just showed him the sack?

A. Showed him the sack?

Q. Did you open the sack up so he could see what was in it?

A. Yes, sir.

Q. What is his name?

A. Woodrow Kirtley.

Q. Are you familiar with the fact that I saw him after I took your deposition and he denied that?

MR. GAUEN: Now, Judge, I object to anything about that. He has had Woodrow Kirtley under subpoena.

THE COURT: I sustain the objection. The jury will not consider it.

MR. GAUEN: Judge at this time I move for a mistrial on something like that. A statement like that from this lawyer to this man's denying it. Its very prejudicial.

THE COURT: I will overrule the motion for a mistrial. Mr. Griffis, I am sure you realize that is improper conduct on your part, attempting to get that into evidence that way. The proper way is to bring Mr. Woodrow Kirtley here. Proceed.

MR. GRIFFIS: Your Honor, I apologize if I' have proceeded against Your Honor's wishes—

THE COURT: It's not against my wishes, it's just not proper.

MR. GRIFFIS: Yes, sir, thank you. I do want to apologize, Your Honor.

THE COURT: All right.

Q. (By Mr. Griffis). Now, you say you counted that money in your automobile?

A. Yes, sir, seems like· I did.

Q. What did you do with it then?

A. I buried it.

Q. Where did you bury it?

A. Out in the back yard.

Q. At what house?

A. Where I lived.

Q. Where did you live, Mr. Kirtley?

A. 3001 Peach Tree Rd.

Q. And what did you bury it in?

A. Seems like it was a metal box, a toolbox.

*   *   *   *   *   *

Q. Have you still got that box?

A. No, sir, I couldn't find it. I did have it in the garage, but I couldn't find it.

*   *   *   *   *   *

Q. Did you tell Mrs. Kirtley about this money or this box when you married her?

A. No, sir.

*   *   *   *   *   *

Q. But you knew any time you wanted to go out there and dig that box up you knew exactly where to dig?

A. That's right. I didn't have any difficulty in finding the location.

Q. Now, you went out there at night, did you Mr. Kirtley, when you wanted to get money out of the box?

A. Yes, sir.

Q. Did you have any sort of a flashlight or anything to dig that box up at night?

A. No, sir.

Q. You went out there in the dark and dug it up?

A. Yes, sir.

Q. And did you have any flashlight to guide you about how much money you were getting out of that box?

A. No, sir, I knew how much.

Q. And you knew the amount of money that you were getting out of the box even without a flashlight, is that right?

A. Yes, sir.

Q. How much did you usually get out of that box?

A. It depended on how much I needed, anywhere from $500.00 to a $1,000, sometimes $2,000.00.

Q. You would get it out in liquid cash?

A. Yes, sir.

Q. Then what would you do with that money when you got it out of the box?

A. Put it in my pocket.

Q. Then what would you do with it?

A. Well, I spent it as I needed to buying houses, buying property.

Q. Would you put that money in the bank?

A. No, sir.

Q. You just put that much liquid cash in your pocket and paid for these houses and whatever else you needed out of this liquid cash, is that right?

A. That's right.

\* \* \* \* \* \*

Q. Your testimony is you never said anything to anybody about this cash other than your uncle and those two men?

A. That's right.

\* \* \* \* \* \*

Q. And after you got the last amount of money out, then what did you do with that box, Mr. Kirtley?

A. I put it back out there in the garage.

Q. On Transit Street?

A. On 1920 Gaylord.

Q. After you moved to Gaylord, is that right?

A. Yes, sir.

Q. Well, did you bury the money for the third time on Gaylord Street?

A. Yes, sir.

Q. All right, you buried the money three times, on Peach Tree, Transit and Gaylord, is that right?

A. Yes, sir.

Q. How much money did you have when you buried the box on Gaylord Street?

A. I don't remember.

Q. Well, approximately?

A. I don't remember.

Q. Well, how long all together would you say that money stayed in the ground?

A. Well, it stayed in the ground from 1946 to 1959.

\* \* \* \* \* \*

Q. (By Mr. Griffis). Mr. Kirtley, I understood you to say a few minutes ago that you would take this money out of the box and put it in your pocket and leave it in your pocket and then make these expenditures out of your pocket to buy the real estate and use it for repairs, is this true?

A. Most of the time, yes, sir. \* \* \*"

Appellant, Mr. Lushion Kirtley, did not produce his uncle, Mr. Woodrow Kirtley, as a witness, to corroborate his testimony as to the alleged gift, nor did he produce any other witness to corroborate his testimony as to the alleged gift. He introduced in evidence income tax reports of himself and wife and testified and gave his version of what monies he and his wife had received and what had been spent. According to his testimony, if it had been fully believed by the jury, he could not have bought all of the properties in question without having received monies other than he claimed he

and his wife had earned from the date of marriage through 1959.

On the other hand, appellee Mrs. Bobbie Kirtley, testified to the effect that since the date of her marriage to Mr. Kirtley, he demanded and received nearly all of the money she earned; she further testified to the effect that Mr. Kirtley was very parsimonious about the spending of money, buying few groceries, not allowing her to spend money for medical and dental work she needed; that she made her own clothes from remnants she purchased cheaply; that when she married Mr. Kirtley he only had the Peachtree Road properties and less than $100.00 in cash; that no one gave appellant any property after their marriage; that no one gave him any money, and that all the property they accumulated was acquired since the date of the marriage.

■ Article 4619, Sec. 1, Vernon's Texas Civil Statutes, provides in part as follows: " * * * all the effects which the husband and wife possess at the time the marriage may be dissolved shall be regarded as common effects or gains, unless the contrary be satisfactorily proved. * * *" The plain wording of said statute creates a rebuttable presumption that all property possessed by a husband and wife when their marriage is dissolved is their community property and imposes the burden upon one asserting otherwise to prove the contrary by satisfactory evidence. Tarver v. Tarver, Tex.1965, 394 S.W.2d 780; Wilson v. Wilson, 145 Tex. 607, 201 S.W.2d 226, 227 (1947); Chapman v. Allen, 15 Tex. 278, 283 (1885).

■ Further the general rule is that to discharge the burden imposed by the statute, a spouse, or one claiming through a spouse, must trace and clearly identify property claimed as separate property. See Tarver v. Tarver, supra, and authorities cited therein.

■ Since the eleven pieces of real estate in controversy were acquired during the marriage the presumption arises that they were community property. The burden of proving that such property was not community but separate property of the husband was upon the husband appellant, and he was required to prove this by "satisfactory evidence". The only evidence produced by appellant was his own testimony and he produced no corroborating witnesses. Generally the testimony of an interested party, when not corroborated, does not conclusively establish a fact even when uncontradicted, but only raises an issue of fact for a jury. Texas Creosoting Co. v. Sims, Tex.Civ.App., 113 S.W.2d 227, error dismissed (1938). Thus the general rule is that the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue for the jury. There is an exception to this rule, which is that where the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, *and there are no circumstances tending to cast suspicion thereon*, it is taken as true as a matter of law. Cochran v. Wool Growers Central Storage Company, 140 Tex. 184, 166 S.W.2d 904 (1952). Clearly this exception is not applicable to the case at bar.

■■ In a jury case, it is the function of the jury to determine the credibility of the witnesses and the weight to be given their testimony. The jury, by their response to Special Issue No. 3, apparently did not believe that appellant purchased the eleven items of property in question with his personal funds, that is, with funds accumulated before his marriage, or funds acquired after his marriage through a gift. The burden of proof on Special Issue No. 3 was on appellant—he did not persuade the jury on this issue by his evidence. After carefully reviewing the entire record in this cause in the light of the rules of law enunciated by the Supreme Court of

**854**

Texas in the case of In re: King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951), we hold that the jury's finding to Special Issue No. 3 was not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. All of appellant's contentions under his point 2 are overruled.

■ Portions of the testimony of appellant Lushion Kirtley, hereinbefore quoted, also show in detail the circumstances surrounding the asking of a clearly improper question by appellee's attorney, referring to Woodrow Kirtley, who was supposed to have been shown the sack of money by appellant Kirtley, and the ruling and instruction of the court thereon is also hereinbefore shown in detail. The improper question was as follows: "Are you familiar with the fact that I saw him after I took your deposition and he denied that?" As shown by the record the trial court sustained the objection of appellant's attorney and instructed the jury not to consider it. While the question was clearly improper, it was never answered, the trial court promptly sustained the appellant's objection, instructed the jury not to consider it, and appellee's attorney apologized for asking the question. After carefully considering the entire record as a whole it is our view that the trial court did not abuse its discretion in refusing to grant a mistrial by reason of said matter herein complained of, and that such matter does not constitute reversible error considering the entire record in this cause. Rule 434, Texas Rules of Civil Procedure. Appellant's point 1 is overruled.

Appellant's point 3 complains of certain comments made by the trial court. No objections were made by appellant to such comments. We have examined the comments and hold that appellant's point 3 does not present reversible error under the record in this cause. Appellant's point 3 is overruled.

The judgment of the trial court is affirmed.