William E. BLANKENSHIP,
Jr., Appellant,

v.

Eugene Jessie E. MIRICK, Jr., and Wife,
Sheila Mirick, individually and as next
friend of E.J. Mirick, III, a minor, Appellees.

No. 10–98–020–CV

Court of Appeals of Texas,
Waco.

Jan. 20, 1999.

Rehearing Overruled Feb. 10, 1999.

Greg White, McGregor & White, Waco, for appellant.

Mark S. Knapp, Benjamin N. Hamilton, Waco, for appellees.

Before Chief Justice DAVIS, Justice CUMMINGS and Justice VANCE.

## OPINION

REX D. DAVIS, Chief Justice.

Sheila Mirick filed suit against William E. Blankenship, Jr. for injuries she suffered as a result of a collision between the 1973 Ford pickup in which she was riding and the 1989 Ford pickup driven by Blankenship. A jury found that Blankenship's negligence proximately caused the collision and awarded Mirick $40,959.03 in damages for pain and mental anguish, loss of earnings, physical impairment, and medical expenses sustained in the past and $30,000.00 in damages for pain and mental anguish, physical impair-

ment, and medical expenses in the future. The court rendered judgment in accordance with the verdict.

Blankenship raises two issues on appeal concerning the legal and factual sufficiency of the evidence to: (1) show that his negligence caused certain of Mirick's injuries; or (2) support the award of damages for past or future physical impairment or future medical expenses.

## FACTUAL BACKGROUND

On May 21, 1994, Blankenship entered Horseshoe Bend Road from a private drive without yielding and headed in a westerly direction along the gravel road. Sheila Mirick's husband Eugene was driving their pickup easterly on the same road. The left side of the Miricks' pickup was positioned near the center of the road.[1] Blankenship believed the Miricks were entering the westbound side of the road and moved to the eastbound side in an effort to avoid a collision. Nevertheless, a collision ensued.

According to the Department of Public Safety trooper who responded to the scene, Blankenship had an alcohol concentration of 0.09 when the trooper administered a preliminary breath test on the roadside about an hour after the collision. The trooper testified that in his opinion Blankenship was intoxicated at the time of the collision due to the loss of the normal use of his mental and physical faculties. *See* TEX. PEN.CODE ANN. § 49.01(2)(A) (Vernon 1994). Mr. Mirick and the trooper both testified that the collision occurred because Blankenship failed to yield the right-of-way and not because Mr. Mirick was driving near the center of the road.

Mrs. Mirick rode in the middle of the Miricks' pickup which did not have a seatbelt for the middle passenger. Thus, she was not wearing a seatbelt at the time of the collision. The force of the collision caused her knees to be "shoved" "up into" the dash. Her knees were bleeding after the collision. A relative who lived nearby transported Mrs. Mirick and her son to the hospital.

In the emergency room, a physician cleansed her wounds and stitched a two-inch laceration across her left knee. Her right knee had "some small abrasions." The doctor ordered x-rays which were "normal." He instructed Mrs. Mirick to stay off her feet for a few days and apply ice to her left knee. She was to return in three days for a follow-up examination. On her return, she reported that her left knee bothered her when she bent or extended it. Another x-ray was "normal." The physician recommended some pain medication and advised that she might need to follow up with an orthopedist if her symptoms did not improve. The physician noted a "possible chondromalacia left knee" (*i.e.,* a bruised left knee) based on the symptoms presented.

Mrs. Mirick's symptoms did not improve, so she saw Dr. Gary L. Becker, an orthopedist, on June 7. She reported pain in both knees to Becker. He suspected and ultimately diagnosed traumatic chondromalacia patella, a bruising of the cartilage beneath the kneecap. Becker recommended further rest; he instructed Mrs. Mirick to do certain exercises on a daily basis to develop her quadriceps which "protect and hold the kneecap in place"; and he prescribed an anti-inflammatory medication to help reduce inflammation in the knee joints. Two weeks later, Becker determined her symptoms had improved and released her to return to work without limitation. He advised her to continue the exercises and to use the anti-inflammatory medication as needed. He told her to return if she experienced further pain.

Mrs. Mirick testified that Becker told her her knees would continue to hurt and "it's going to take some time." She continued to experience swelling, redness, and "a lot of pain." She finally returned to see Becker again almost ten months after her last visit "because the pain had just got so bad." When Becker examined her in April 1995 her x-rays revealed "laterally positioned patella" meaning her kneecaps had shifted from their normal positions. He prescribed a conservative treatment regimen including continua-

---

1. Eugene Mirick testified that Horseshoe Bend Road is poorly maintained and that drivers regularly drive near the center of this gravel road until oncoming traffic approaches, at which time each vehicle moves to its respective side of the road to pass.

tion of the exercises previously recommended and prescription anti-inflammatory medication as needed. At this point, Becker determined that if the conservative regimen was not successful he would have to perform a surgical procedure known as a lateral retinacular release to allow the kneecap "to come back where it belongs."

Mrs. Mirick continued the conservative regimen for another five months. She experienced "increasing problems of pain in both knees." In October, Becker operated on her left knee which was "more symptomatic." Mrs. Mirick had a number of post-operative follow-up visits with Becker. In January 1996, Becker noted that she had "done well" with the left knee but was "[n]ow having significant symptoms on the right side." He operated on the right knee in February. After this operation, Becker noted in a follow-up examination that Mrs. Mirick had "[g]ood mobility" in the knee and "very little grinding and crepitation."[2] He did not note any complaints of pain. About a month later Becker examined her again. He determined that the surgery had done "exceptionally well" for her condition. He noted "some swelling" but did not anticipate "any significant permanent disability."

In November Mrs. Mirick returned complaining that she continued to experience pain. Becker referred her to a physical therapist. He noted in January 1997 that she still had "some problems" but was being helped by the physical therapy. He recommended additional sessions with the therapist and advised her to purchase an elastic knee support to help stabilize her patella. Six months later, Mrs. Mirick again saw Becker. She continued to experience pain at this time. Becker advised her to continue her exercises and take anti-inflammatory medications as needed. He asked her to return for a follow-up evaluation in two months. The trial began about two months later. Mrs. Mirick apparently did not return to Becker's office before trial.

## CAUSATION

Blankenship's first issue questions the legal and factual sufficiency of the evidence to support the jury's award of damages insofar as it compensates Mrs. Mirick for any medical expenses she incurred after Becker released her for work without any restrictions one month after the collision. Specifically, Blankenship asserts that the record contains no evidence or factually-insufficient evidence to demonstrate that his negligence in reasonable medical probability caused the dislocation of her kneecaps. Thus, he contends she is not entitled to compensation for the medical expenses she incurred for the treatment of this condition.

### A. THE STANDARD OF REVIEW

When we decide a "no evidence" point, we consider only the evidence and inferences which tend to support the contested issue and disregard all evidence and inferences to the contrary. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). We will sustain a no evidence point if: (a) there is a complete absence of evidence of a vital fact; (b) we are barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L.REV. 361, 362–63 (1960)). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)).

A factual sufficiency challenge requires us to consider and weigh all the evidence, not just the evidence which supports the verdict. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (*per curiam*); *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). We

---

**2.** Dr. Becker explained that "crepitation" "is a sort of a grinding sensation" caused by an "[i]n-   jury to the cartilage surface of the kneecap."

will "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain,* 709 S.W.2d at 176.

## B. CAUSATION

■ To recover damages in a personal injury case, a plaintiff must establish two causal nexuses: (1) a causal nexus between the conduct of the defendant and an event; and (2) a causal nexus between the event and the plaintiff's injuries. *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex. 1984); *accord Crye,* 907 S.W.2d at 499. Because Blankenship concedes his negligence proximately caused the collision, we focus on only the second causal nexus.

■ "The causal nexus between the event sued upon and the plaintiff's injuries must be shown by competent evidence." *Morgan,* 675 S.W.2d at 732. Lay testimony can adequately prove this nexus:

> in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition. Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation.

*Id.* at 733 (citations omitted). In such cases, lay testimony can provide both legally and factually sufficient evidence to prove the causal relationship. *See Maritime Overseas Corp. v. Ellis,* 886 S.W.2d 780, 791 (Tex. App.—Houston [14th Dist.] 1994) (op. on reh'g), *writ denied per curiam,* 977 S.W.2d 536 (Tex.1996); *Cities Servs. Co. v. Ellison,* 698 S.W.2d 387, 388–89 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

■ The term "reasonable medical probability" relates to the question of whether "competent evidence" on the issue of causation has been shown and not to the standard by which an expert witness must testify. *See Bradley v. Rogers,* 879 S.W.2d 947, 954 (Tex.App.—Houston [14th Dist.] 1994, writ denied). "Reasonable probability is determined by the substance and context of [an expert's] opinion, and does not turn on se-

mantics or on the use of a particular term or phrase." *Crye,* 907 S.W.2d at 500. Without more than "proof of mere possibilities" however, the evidence "will not support the submission of an issue to the jury." *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988).

■ An expert may appropriately testify concerning *possible* causes of the plaintiff's condition to assist the jury in evaluating other evidence of causation in the case. *Bradley,* 879 S.W.2d at 954. However, a *possible* cause becomes *probable* only "when in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result of its action." *Parker v. Employers Mut. Liability Ins.* Co., 440 S.W.2d 43, 47 (Tex.1969); *Bradley,* 879 S.W.2d at 954; *accord Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 707 (Tex. 1970). "This is the outer limit of inference upon which an issue can be submitted to the jury." *Parker,* 440 S.W.2d at 47; *Bradley,* 879 S.W.2d at 954.

■ Accordingly, a jury may decide the required causal nexus between the event sued upon and the plaintiff's injuries when:

- general experience and common sense will enable a layperson fairly to determine the causal nexus;
- expert testimony establishes a traceable chain of causation from the injuries back to the event; or
- a probable causal nexus is shown by the expert testimony.

*Lenger,* 455 S.W.2d at 706; *Bradley,* 879 S.W.2d at 954. This does not mean however that a court is limited to only one of these categories to the exclusion of the others in evaluating the sufficiency of the evidence. *See Lenger,* 455 S.W.2d at 706; *Bradley,* 879 S.W.2d at 954.

## C. PERTINENT TESTIMONY

Mrs. Mirick testified that she had experienced no problems with her knees before the collision. She was employed before the collision as a nurse's aide. Her duties included helping disabled patients from their beds and assisting them in using the bathroom and bathing. Her work required lifting, bending, and stooping. Mr. Mirick testified that his

wife never had complained about her knees prior to the collision.

Becker released Mrs. Mirick to return to work on June 22, 1994. He told her that her knees would continue to hurt and it would take time for her injuries to completely heal. She followed the exercises recommended by Becker and took pain medication as needed. Nevertheless, she continued to experience swelling and "a lot of pain" in her knees. She returned to Becker's office in April 1995 "because the pain just got so bad."

Mrs. Mirick's knee x-rays in the emergency room and at Becker's office were initially normal. Becker noted "no ligamentous instability" meaning he detected no looseness in her knees. When she returned ten months after her initial release, x-rays revealed the displacement of her kneecaps. Becker's notes from this examination reflect that he decided to first pursue a conservative treatment regimen but he acknowledged that surgery might be necessary to "improve this situation." The conservative regimen did not alleviate Mrs. Mirick's condition, and Becker ultimately operated on both knees.

Mrs. Mirick's counsel asked Becker whether the collision caused the dislocation of her kneecaps. Becker replied:

I don't think that the automobile accident dislocated or pushed the kneecap out of position. Probably what happened is that either she already had a congenital condition that may have had the kneecap positioned in that way anyway. We see people all the time without—even without injuries or trauma that had this problem.

It may have been part of it that she had a predilection or preexisting problem with her kneecap that this accident—the trauma aggravated the kneecap enough to magnify this problem, or it could have been that from the injury to the kneecap and because of the pain with it, she may have just not exercised the knee enough and allowed those muscles to weaken, and as they weakened, it may have allowed this kneecap to slide over further just sort of compounding the problem.

Becker was later asked whether he could say in reasonable medical probability that there is a greater possibility that Mrs. Mirick's condition was caused by the trauma of the collision or a preexisting condition.

BECKER: I really wouldn't be able to say. If she had a problem with a preexisting condition, certainly she would have—hopefully would have sought solution for it if it was giving enough trouble, but just the fact that she hadn't sought symptoms or mentioned it to a healthcare provider before doesn't mean that a preexisting condition wasn't there.

COUNSEL: Okay. If there were a preexisting condition, then in all reasonable medical probability, it is [sic] exacerbated by the trauma of the accident?

BECKER: That would certainly be my position. I mean, I could not say that she didn't have a preexisting condition, but certainly if she had a preexisting condition, which is not symptomatic, and her symptoms started after the accident, I would have to assume that the accident was responsible for bringing those symptoms on.

### D. APPLICATION

#### 1. Legal Sufficiency

■ Mrs. Mirick testified without contradiction that she had experienced no problems with her knees before the collision. She followed Becker's instructions concerning daily exercises, avoidance of certain activities, and medication. She continued to experience pain during the nine months between June 1994, when Becker first released her for work, and April 1995 when she returned for another examination "because the pain just got so bad." Becker diagnosed the dislocation of her kneecaps during this April 1995 examination.

Mrs. Mirick's testimony establishes "a sequence of events which provides a strong, logically traceable connection between the [collision] and [her] condition." *Morgan*, 675 S.W.2d at 733. This constitutes "more than a mere scintilla" of evidence of causation. *Havner*, 953 S.W.2d at 711. Accordingly, the evidence is legally sufficient to support the jury's award of damages for Mrs. Mirick's subsequent surgeries and treatments.

## 2. Factual Sufficiency

Blankenship's first issue centers on whether Becker established by a reasonable medical probability that the dislocation of Mrs. Mirick's kneecaps was caused by the collision. To determine whether Becker's testimony adequately supports the jury's finding of causation on this issue, we look to the "substance and context" of his testimony and not on "semantics or on [his] use of a particular term or phrase." *Crye*, 907 S.W.2d at 500.

The context of Becker's testimony reveals his firm belief that Mrs. Mirick's kneecaps were not dislocated immediately following the collision. He identified two probable scenarios under which the dislocation likely occurred: (1) a pre-existing condition (either congenital or otherwise) which was exacerbated by the trauma associated with the collision; or (2) because of the pain caused by the traumatic chondromalacia condition, she was unable to exercise her knees sufficiently to prevent muscle atrophy which in turn "allowed the kneecap to slide over." Under either scenario, the requisite causal nexus is present. *See Driess v. Friederick*, 73 Tex. 460, 462, 11 S.W. 493, 494 (1889); *Thompson v. Quarles*, 297 S.W.2d 321, 329–330 (Tex.Civ. App.—Galveston 1956, writ ref'd n.r.e.); *accord Coates v. Whittington*, 758 S.W.2d 749, 752–53 (Tex.1988) (orig.proceeding) (all holding that a tortfeasor takes a plaintiff as he finds him and is therefore liable for any damages proximately caused by his conduct even if such damages represent an exacerbation of a condition antedating the event sued upon).

The combination of Mrs. Mirick's testimony and Dr. Becker's testimony provided the jury sufficient evidence that it is "more likely than not" her dislocated kneecaps resulted from Blankenship's negligent actions because Blankenship's conduct directly caused the traumatic chondromalacia condition which either exacerbated a pre-existing condition or subsequently led to the dislocation of the kneecaps. *Parker*, 440 S.W.2d at 47; *Bradley*, 879 S.W.2d at 954. We cannot say the jury's decision to award damages for Mrs. Mirick's subsequent surgeries and treatments is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176. Accordingly, the evidence is factually sufficient to support the jury's award of these damages.

## 3. Summary

We have found the evidence legally and factually sufficient to support the jury's award of damages for Mrs. Mirick's subsequent surgeries and treatments. Thus, we overrule Blankenship's first issue.

## OTHER DAMAGES

Blankenship's second issue challenges the legal and factual sufficiency of the evidence to support the jury's award of damages for past and future impairment and for future medical expenses. With regard to the damages for impairment, Blankenship contends that the evidence does not distinguish between damages incurred as a result of pain and suffering and damages suffered due to impairment. Concerning damages for future medical expenses, Blankenship asserts the award is based entirely on speculation as the record contains no evidence or insufficient evidence of the need for future treatment or the amount of future medical expenses she may incur.

## A. PAST AND FUTURE IMPAIRMENT

To recover damages for past or future impairment, a plaintiff must prove "that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated." *Lawson–Avila Constr., Inc. v. Stoutamire*, 791 S.W.2d 584, 599 (Tex.App.—San Antonio 1990, writ denied) (quoting *Green v. Baldree*, 497 S.W.2d 342, 350 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ)); *see also Pipgras v. Hart*, 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied) (future impairment only).

Mr. Mirick testified that his wife now cannot walk as well as before the collision. "She can't stay on her feet—on her legs as long.

Her knees give out." According to Mrs. Mirick, she cannot do aerobic exercises as she did before the collision. She wears elastic braces to stabilize her kneecaps when she walks, usually "about an hour a day."

Dr. Becker cannot say Mrs. Mirick's knees "will be normal again" and her condition "certainly can be" disabling. According to the doctor, she "has a predisposing condition that would make the likelihood of arthritis developing much higher" "with the passage of time." He said the following about Mrs. Mirick's "future with her knees":

> Well there's—you know, there's certainly consideration that she could have a further problem with it. Arthritic conditions could go on and compress [sic] from her current status keeping her weight down. Keeping her exercise activity up to a good level, keeping her muscle tone developed, avoiding activities where she has to do a lot of knee bending such as exercising on a Stairmaster or going up and down stairs or steps a lot would be things she needs to avoid, but walking level surfaces and that sort of thing I wouldn't put a limitation on that, and I don't think that would necessarily cause problems.

The jury awarded Mrs. Mirick $5,000 in damages for past physical impairment and $5,000 for future impairment.

Becker cannot say Mrs. Mirick's knees will be "normal again." He recommends that she limit her activities. Mr. and Mrs. Mirick both described instances where her physical activities have been limited since the collision. This constitutes "more than a mere scintilla" of evidence of impairment. *Havner*, 953 S.W.2d at 711. Moreover, from this evidence we cannot say the jury's award of damages for past and future impairment is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176. Accordingly, the evidence is legally and factually sufficient to support the jury's award of these damages.

### B. FUTURE MEDICAL EXPENSES

■ On the subject of future medical expenses, this Court has stated:

An award of future medical expenses is primarily a matter for the jury. *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). No precise evidence is required. *Id.* Such an award may be based on the nature of the injuries, the medical care rendered in the past, and the condition of the injured party at the time of trial. *Id.* Testimony of a "reasonable medical probability" by a medical expert is not a prerequisite to a recovery for future medical expenses. *Id.* If there is any probative evidence which supports the jury's finding of future medical expenses, then the award must be upheld. *Id.* at 406.

*Strahan v. Davis,* 872 S.W.2d 828, 832 (Tex. App.—Waco 1994, writ denied); *accord City of San Antonio v. Vela,* 762 S.W.2d 314, 320–21 (Tex.App.—San Antonio 1988, writ denied).

Blankenship cites the Dallas court's opinion in *Thate v. Texas & Pacific Railway Co.* for the proposition that expert testimony is required to establish whether in reasonable medical probability the plaintiff will incur future medical expenses. 595 S.W.2d 591 (Tex.Civ.App.—Dallas 1980, writ dism'd). What the *Thate* opinion actually says however is:

> The *preferred* practice, in order to provide the jury with guidelines to arrive at their verdict, is to have the physician testify with reasonable professional certainty about the kind of services that will be required and the reasonable value of those services. This is particularly advantageous when the services which may be required in the future differ from those received in the past. Despite these *preferred* practices, however, the *only requirement* to support a verdict on this issue is that there be evidence in the record of the reasonable value of past medical treatment and to establish the probable necessity of future medical treatment. Determination of the expense of future treatment is a matter for the jury to determine in the exercise of their sound discretion under proper instructions from the court.

*Id.* at 601 (emphasis added).

Notwithstanding the emphasis on *preferred* as opposed to *required* practices in

*Thate*, Blankenship's argument finds some support in another opinion of the Dallas court. Citing *Thate*, that court has said, "A jury determines whether a plaintiff in reasonable probability will incur future medical expense by considering the substance of a competent expert witness's testimony." *Williams Distr. Co. v. Franklin*, 884 S.W.2d 503, 510 (Tex.App.—Dallas 1994), *rev'd on other grounds per curiam*, 898 S.W.2d 816 (Tex.1995); *see also Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 682 (Tex.App.—Texarkana 1991, writ denied) ("The term *reasonable probability* [in the context of future medical expenses] is determined by a consideration of the substance of the testimony of the expert witness").

■ Our research has revealed no cases other than these two suggesting that expert testimony is required to establish whether in reasonable medical probability the plaintiff will incur future medical expenses. Rather, the vast majority of the cases follow the rule quoted above from *Strahan. See, e.g., Pipgras*, 832 S.W.2d at 365–66; *Vela*, 762 S.W.2d at 320–21; *Keller Indus., Inc. v. Reeves*, 656 S.W.2d 221, 226–27 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *Hughett*, 624 S.W.2d at 405. Thus, we will continue to follow this rule when reviewing the sufficiency of the evidence to support an award of damages for future medical expenses.[3]

Accordingly, we may consider the following in assessing the sufficiency of the evidence to support the jury's award of damages for future medical expenses:

- that Mrs. Mirick's injuries required immediate emergency treatment at the hospital;

- that her condition required examination by a specialist less than three weeks after the collision;

- that her condition has required repeated follow-up visits with the specialist for further evaluation and treatment during the three years following the collision;

- Becker's testimony concerning the extent of her injuries;

- the medical treatments she has received in the past for her injuries;

- that she has required two corrective surgeries;

- that her past medical expenses totaled $13,178.79;

- that she continues to experience pain in her knees notwithstanding the surgical procedures and her compliance with the specialist's recommendations for exercises and moderation of activities;

- Becker's testimony concerning her future prognosis, particularly his comment that she "has a predisposing condition that would make the likelihood of arthritis developing much higher" "with the passage of time" which "certainly can be [disabling]";

- the positive results she obtained from physical therapy sessions in the months following her surgeries; and

- Becker's testimony that she has achieved maximum medical recovery (*i.e.*, that nothing further medically can be done to alleviate her symptoms).

*See Vela*, 762 S.W.2d at 321.

Having considered the nature of Mrs. Mirick's injuries, the medical care she has received in the past for these injuries, her condition at trial, and the prognosis provided by her doctor, we conclude that "more than a mere scintilla" of evidence exists to support the jury's award of $5,000 in damages for future medical expenses. *Havner*, 953 S.W.2d at 711. Moreover, from this evidence we cannot say the jury's award of damages for future medical expenses is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176. Accordingly, the evidence is legally and factually sufficient to support the jury's award of these damages.

---

3. This does not mean, however, that expert testimony should not be considered when evaluating the sufficiency of the evidence to support an award of damages for future medical expenses. *See, e.g., Strahan v. Davis*, 872 S.W.2d 828, 832–33 (Tex.App.—Waco 1994, writ denied); *Berry* *Prop. Mgt., Inc. v. Bliskey*, 850 S.W.2d 644, 664 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.); *Pipgras v. Hart*, 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied) (each considering expert testimony in assessing sufficiency of evidence).

### C. Summary

We have found the evidence legally and factually sufficient to support the jury's award of damages for past and future impairment and for future medical expenses. Accordingly, we overrule Blankenship's second issue.

Having overruled the issues presented, we affirm the judgment.

CUMMINGS, J., not participating.