# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00721-CV

**Patrick James McShane, Appellant**

**v.**

**Claudia Maria McShane, Individually and as Next Friend
of J. M., a Minor, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. C2000-0491A, HONORABLE HENRY J. STRAUSS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

While stationed with the military in Germany in 1984, appellant Patrick James McShane met and married appellee Claudia Maria McShane,[1] a German citizen. They moved to the United States in 1985 and to Texas in 1986, where they had two childrenCR.M., a son, born in August 1986, and J.M., a daughter, born in January 1988. In May 2000, Claudia sued for divorce and for intentional infliction of emotional distress individually and as next of friend of J.M., alleging Patrick had sexually assaulted and threatened their daughter over a period of nine years. During the jury trial, four pornographic photographs

---

[1] Because the parties share the same last name, for clarity, we will respectfully refer to them by their first names.

of J.M. were admitted into evidence, along with numerous pornographic videos and publications characterized as child pornography, all seized from the McShane home. J.M. testified that Patrick started molesting her when she was about three years old and the abuse continued until she was twelve. She said that when she was about six years old Patrick made her watch pornographic videos[2] with him and took videos of her naked or wearing lingerie; he repeatedly told her that if she reported the molestation he would kill her and whomever she told. Throughout the trial, Patrick refused to answer any questions related to the sexual abuse or his possession of child pornography, invoking his right against self-incrimination.

---

[2] Among the child pornography introduced into evidence were: photographs of naked children from an internet website called www.little-virgins.com; pornographic stories entitled ADaddy Taught Me All I Know,@ and ADaddy=s Naughty Daughters@; the pornographic books *Hot for Daddy* and *The Daddy Lovers*; and pornographic videos titled *Darling Nikki (Daddy=s Darling Daughter)* and *Cherry Poppers #7*.

The jury failed to award Claudia damages for intentional infliction of emotional distress, and she does not complain of this finding on appeal. The jury did award J.M. more than $900,000 in actual and exemplary damages associated with Patrick=s long-term sexual abuse,[3] including $50,000 in future medical expenses. On appeal, this $50,000 in future medical costs is the only element of tort damages that Patrick challenges. The jury also found certain assets to be Claudia=s separate property, and failed to find that Patrick was entitled to reimbursement for separate funds expended to benefit the community. The trial court=s final judgment incorporated the jury=s findings and awarded 65% of the community estate to Claudia, 35% to Patrick. On appeal, Patrick claims that the evidence is legally and factually insufficient to support the findings that J.M. will incur future medical expenses of $50,000, that certain funds are Claudia=s separate property, and that Patrick=s separate estate is not entitled to reimbursement from the community. Patrick also asks that we abate this appeal and remand to the trial court to enter findings of facts. After a thorough review of the record, we will affirm the trial court=s judgment in its entirety.

### J.M.=s Future Medical Damages

An award of future medical damages is primarily left to the jury=s determination. *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.CHouston [1st Dist.] 1999, pet. denied); *Blankenship v. Mirick*, 984 S.W.2d 771, 778 (Tex. App.CWaco 1999, pet. denied). To recover such damages, the claimant must show aAreasonable probability@ that medical expenses will be

---

[3] J.M. was awarded $100,000 for past actual damages, $400 for past medical costs, $500,000 for future actual damages, $50,000 for future medical costs, and $284,000 in exemplary damages.

3

incurred in the future. *Machala*, 995 S.W.2d at 828; *Whole Foods Mkt. SW, L.P. v. Tijerina*, 979 S.W.2d 768, 781 (Tex. App.CHouston [14th Dist.] 1998, pet. denied). No precise evidence is required to support an award for future medical costs, nor must a plaintiff prove such costs by expert medical testimony. *Tijerina*, 979 S.W.2d at 781. If any probative evidence supports a jury=s finding of future medical expenses, we will uphold the award. *Blankenship*, 984 S.W.2d at 778. It is left to the jury=s sound discretion to determine what amount, if any, should be awarded for future medical costs. *Tijerina*, 979 S.W.2d at 781.

Claudia testified that when she learned about Patrick=s abuse of J.M. in February 2000, she took J.M. to a counselor. J.M. testified in a deposition about the nine years of sexual abuse and said that Ait will probably affect me the rest of my life.@ J.M. was seeing a therapist and attending group counseling sessions, and she did not yet know if counseling would be helpful, saying, AIt will show probably later.@ Since February, J.M. had seen several therapists, including Dana Scoville-Stone, a licensed professional counselor, and Nancy Ratliff, a psychotherapist in San Antonio. Ratliff charges between $100 and $120 a session, and Claudia said that she wanted J.M. to continue to see Ratliff in the future. Scoville-Stone testified by deposition that J.M. exhibited signs of depression and Athinks of dying but . . . doesn=t want to go through with it.@ She did not believe that J.M. needed medication for her depression, but said J.M. is very angry with her father and has feelings of anger, guilt, and sadness.

Dr. David Gunzburger, a clinical psychologist who was treating Patrick for pedophilia, testified that in the course of his treatment of Patrick, he saw J.M. once. Based on his consultation with her and his experience with roughly 400 other sexually abused children, Gunzburger concluded that J.M. is

**4**

"profoundly impacted" and "has blocked off the recognition of the long-term implications of what's gone on. She is dealing right now with being angry at her dad, not wanting people to know about it." He testified as follows:

> I believe that [J.M.] does need some help in getting out of that box. She seems less affected than some of the kids that I've seen. . . . I think she's sad. I think she's angry. . . . She at first said that she knew that it was totally her father's deal, and then told me that maybe she was slightly to blame because if she would have done some things it wouldn't have happened. She and I spent some time with that. I think she's got to do some more work on that. I think she feels isolated. She told me she feels isolated. When I talked to her, which was now almost two months ago, she was pretty flat in her presentation. Most kids her age are—you giggle or are goofy or something, and she was kind of like—holding down her own emotions is a reasonable description of what I think.

Gunzburger further testified that although she has not developed a "suicide plan," J.M. told him that she has thought about suicide and is not afraid of it; he added that although many people entertain thoughts of suicide at some point, J.M. was "pretty young to be talking about this kind of stuff." Gunzburger opined that J.M. was "suffering from severe emotional distress" and "most of her symptoms are more subtle than she's willing to address at this point."

The evidence clearly shows a "reasonable probability" that J.M. will need counseling in the future. *See Machala*, 995 S.W.2d at 828. J.M. was sexually abused for nine years, starting when she was three years old. The evidence indicates that counseling will cost about $100 a session and that J.M. will need therapy to deal with her feelings of guilt, anger, and depression. The doctor treating Patrick for pedophilia believed, based on only one consultation with J.M., that she was "profoundly impacted" by the years of abuse and molestation inflicted by Patrick. The jury's awards of $100,000 for past actual

**5**

damages, $500,000 in future actual damages, $400 in past medical costs, and $50,000 in future medical costs clearly indicate that the jury believed that the vast majority of J.M.=s damages would occur in the future, when she begins to work through the abuse and her feelings of guilt and anger. Patrick only appeals the award of $50,000 for future medical costs; he does not complain of the remaining $600,400 in damages or the $284,000 in exemplary damages. The jury concluded that J.M.=s future medical costs would amount to $50,000, and Patrick has not shown that the supporting evidence was legally or factually insufficient. *See Blankenship*, 984 S.W.2d at 778. We overrule the first issue on appeal.

### Claudia=s Separate Property

A spouse=s separate estate consists of property owned before marriage, property a spouse acquires during the marriage by gift or inheritance, and recovery for personal injuries (other than lost earning capacity) suffered by the spouse during marriage. Tex. Fam. Code Ann. ' 3.001 (West 1998). Property owned by either spouse at the time of divorce is presumed to be community property; the spouse claiming separate property must overcome that presumption by clear and convincing evidence and generally must trace and clearly identify the property claimed. *Id*. ' 3.003 (West 1998); *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.CHouston [1st Dist.] 1995, writ denied). A trial court may not divest a spouse of his or her separate property in a divorce proceeding. *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex. 1977). Uncorroborated testimony of an interested witness, even if uncontradicted, generally does not establish a fact conclusively, but creates a fact issue for the jury=s determination. *Kirtley v. Kirtley*, 417 S.W.2d 847, 853 (Tex. Civ. App.CTexarkana 1967, writ dism=d w.o.j.).

The jury found that the following were Claudia=s separate property: a San Antonio Credit Union savings account (Athe SACU account@) opened in 1995 in Claudia=s name alone;[4] $2,800 held by Claudia at the McShanes= Bulverde home; and about $20,000 held by Claudia=s family in Germany. Several German bank accounts were found to be community property.[5]

---

[4]     At the time of trial, the SACU account had a balance of about $22.

[5] The divorce decree states that the German accounts Ahad a balance of $16,126.00 at the time of the jury=s verdict@; Patrick does not attack that valuation, and we will assume it is correct.

Claudia met Patrick in Germany in 1982 when she was about twenty-six years old; they married in April 1984 and moved to the United States in 1985. After Claudia and Patrick married, they established two joint accounts in Germany that remained open when she and Patrick moved to the United States in 1985; the accounts were worth a total of 12,000DM at maturity.[6] Claudia testified that when she married she had between 30,000DM and 40,000DM in German bank accounts in her name alone; she moved her money from bank to bank depending on the interest rates. In 1990, when one of the joint accounts matured, Claudia redeposited it into an account in her name alone; she testified that it was an innocent mistake, not an attempt to conceal or steal money from the community estate. Aside from that deposit, the only deposits made to Claudia=s separate German accounts during her marriage were monies she inherited or received as gifts: about $25,000 she inherited from her father in 1990 and frequent gifts from her family. Claudia did not have documentary proof of the gifts, her inheritance, or her pre-marriage bank balances. Claudia testified that dating back to 1992 she had given various family members power of attorney to manage her separate German accounts. She recently gave her sister power of attorney to

---

[6] Claudia testified that she only knew about her German assets in terms of German Deutschmarks (ADM@). She thought that the exchange rate was approximately two DM for one U.S. dollar. Patrick does not dispute that rate and uses it in his appellate brief. The evidence related to the accounts and money held in Germany is somewhat confusing because some of the accounts originated almost twenty years ago and many of the records are in German.

withdraw substantial sums of money to be reinvested when she could obtain a higher yield; the money had not yet been reinvested, pending the outcome of the divorce proceedings, but is being held in an aunt=s account.[7]

In 1997, Claudia brought back several thousand dollars from Germany, funds she claimed were her separate property. She used some of the funds for the benefit of the community and deposited the remainder into her SACU account. She also deposited into the SACU account additional cash gifts from her family and $165 earned during the marriage. On May 15, 2000, Claudia withdrew from her SACU account about $9,000, of which she had about $2,800 left at the time of trial, leaving an account balance of $5. Claudia testified that on May 30, 2000, five days after she filed for divorce, she transferred $1,290 of community funds into her SACU account and used the money for groceries and for the children=s needs; as of September 2000, the SACU balance was about $22. She testified that she hid the account from Patrick because he would not allow her to keep cash on hand and instead required her to use credit cards to buy the family=s groceries and other necessities.

Evidence supports the jury=s finding that the money held by Claudia=s family was her separate funds. Claudia testified that she had saved between 30,000DM and 40,000DM at the time she was married, inherited $25,000, and was given considerable cash gifts by her family. These funds were deposited into her separate German accounts, and Claudia=s aunt was holding about 37,182DM from those accounts. That money is no longer in an account in the McShanes=name or even in Claudia=s name alone; it

---

[7] At the time of trial, Claudia=s family had about 37,182DM, or $20,000, in their possession.

is under Claudia=s aunt=s name in Germany. The remaining German accounts, at least some of which are in Claudia=s name alone, were determined by the jury to be community property, thus accounting for the joint accounts left in Germany when the McShanes moved to the United States. The evidence is legally and factually sufficient to support the finding that the money in Germany possessed by Claudia=s relatives was her separate property.

As discussed above, the evidence also supports a finding that the SACU account was opened and, until May 30, 2000, funded by Claudia=s separate funds. On May 15, Claudia withdrew almost all of the money remaining in her SACU account, leaving a balance of $5. The jury properly found that any money left from that withdrawal, about $2,800, was Claudia=s separate property. On May 30, Claudia transferred $1,290 of community property into the account and then used most of those community funds to support the family; the money remaining in the SACU account at the time of trial, $22, was community property. Further, Claudia deposited $167 in community funds into that account during the marriage. However, the $22 SACU balance and the $167 in community funds total $187. We will not reverse a divorce decree and division of property for an error that would have had only a *de minimis* effect on the division of the community estate. *McElwee*, 911 S.W.2d at 189. We overrule the second issue on appeal.

## Patrick=s Claim for Reimbursement

The use of one=s separate property to benefit the community estate may give rise to a claim of reimbursement by the contributing estate. *Penick v. Penick*, 783 S.W.2d 194, 196-97 (Tex. 1988); *Wilkerson v. Wilkerson*, 992 S.W.2d 719, 722-23 (Tex. App.CAustin 1999, no pet.). The right to

**10**

reimbursement is an equitable right left to the discretion of the fact finder. *Penick*, 783 S.W.2d at 197; *Purser v. Purser*, 604 S.W.2d 411, 414 (Tex. Civ. App.CTexarkana 1980, no writ).[8] As noted above, to overcome the presumption of community property, the spouse claiming particular property as separate property must clearly trace and identify the claimed property and the uncorroborated testimony of an interested witness generally does not conclusively establish a fact, instead it creates a fact issue for the jury. *Purser*, 604 S.W.2d at 413; *Kirtley*, 417 S.W.2d at 853. An exception to that rule arises when the testimony is uncontradicted, clear, direct, positive, and free from inaccuracies or suspicious circumstances. *Kirtley*, 417 S.W.2d at 853.

The parties stipulated that in 1996 Patrick inherited $172,943 from his parents. Patrick claims that he used his inheritance to pay for the Bulverde house. The parties agreed that the Bulverde property was worth $395,000 at the time of trial, and the outstanding debt was between $106,000 and $112,000. At trial, he testified briefly about the McShanes=equity in the property, saying, A[P]art of that is

---

[8] At the time of trial, section 3.404 of the family code provided that a spouse=s separate estate might have Aan equitable interest in the enhanced value of the separate estate of the other spouse or in the enhanced value of the community estate.@ *See* Act of May 26, 1999, 76th Leg., R.S., ch. 692, ' 2, 1999 Tex. Gen. Laws 3292, 3293, *amended by* Act of May 22, 2001, 77th Leg., R.S., ch. 838, ' 2, 2001 Tex. Gen. Laws 1679, 1681-82. Under the current code, section 3.408 governs reimbursement and provides that a Acourt shall resolve a claim for reimbursement by using equitable principles.@ Tex. Fam. Code Ann. ' 3.408(c) (West Supp. 2003).

$172,000 of my inheritance; plus other monies that I received from the other house that I sold; and some of that is just growth.@ A financial expert testified that had Patrick invested his inheritance at a conservative rate, it would have doubled in value by the time of trial. Claudia testified that Patrick did not tell her what he was going to do with his inheritance, but when asked if she knew that his inheritance went into the Bulverde house, she answered, AProbably, yeah.@ Claudia also indicated that Patrick wrote a check on his personal account in June 1998 to help pay for the Bulverde foundation. Patrick testified that from the time of his marriage until the late 1990s, he used community funds to pay for mortgages and repairs to two properties owned by his separate estate. He said that when the properties were sold, he deposited the proceeds into the community bank accounts. Patrick also testified that he removed about $1,380 from J.M.=s savings account and used it to pay credit card bills. The jury denied Patrick=s claim for reimbursement.

The trial lasted for about six days, and aside from the testimony quoted above, there was almost no testimony as to Patrick=s use of separate funds to pay for the Bulverde property. Patrick had the burden of proof at trial of showing his entitlement to reimbursement and, therefore, on appeal he must show not only that no evidence supported the jury=s refusal to find in his favor, but that he was entitled to reimbursement *as a matter of law*. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989); *Nesmith v. Berger*, 64 S.W.3d 110, 115 (Tex. App.C Austin 2001, pet. denied). Having reviewed the record, in particular the testimony and evidence pointed to by Patrick in support of his argument, we do not believe he clearly showed that the funds used for the Bulverde property came from his inheritance or established his right to reimbursement as a matter of law. *See Purser*, 604 S.W.2d at 413; *Kirtley*, 417 S.W.2d at 853.

**12**

Further, reimbursement is an equitable remedy and equity in this cause does not favor Patrick. Patrick subjected his daughter to horrendous abuse over nine years, threatened to kill her if she told anyone, and was extremely controlling of his wife=s financial independence. He emptied J.M.=s savings account to pay credit card bills and used community funds to pay for two properties held by his separate estate, and although the sale proceeds were deposited into the community estate, the record is not clear as to whether the community estate was benefitted or harmed by those expenditures. Considering the evidence as a whole, the jury=s decision to deny reimbursement, an equitable remedy, was not unsupported by the evidence. We overrule the third issue on appeal.

## Findings of Fact

Patrick contends that the trial court erred in refusing to make findings of fact related to the court=s awarding Claudia Aa grossly disproportionate share of the community estate and [denying Patrick=s] reimbursement claims@ and that the lack of findings of fact Amakes it even more difficult to evaluate the effect of the mischaracterization of various marital assets upon the division of property as a whole.@[9] All of Patrick=s issues on appeal attack the jury=s findings; therefore findings of fact related to his issues would not have been appropriate. *See* Tex. R. Civ. P. 296 (party to non-jury trial may request findings of fact); *Roberts v. Roberts*, 999 S.W.2d 424, 433 (Tex. App.CEl Paso 1999, no pet.) (in trial to both jury and court, findings available related to non-jury issues). Patrick does not challenge on appeal the disproportionate distribution of the community estate, and does not explain how the lack of fact findings has

---

[9] The jury found that Patrick was not entitled to reimbursement; the trial court=s judgment merely reflects that finding. We have fully analyzed the issues of reimbursement and Claudia=s separate property.

**13**

prevented him from bringing such a complaint. The record amply supports a disproportionate division of the estate. *See Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (affirming in part and reversing in part on other grounds, 935 S.W.2d 430, 432-33 (Tex. App.CSan Antonio 1995)). Even if findings of fact were appropriate, Patrick has not shown he was harmed by a lack of findings related to his appellate issues because the circumstances of the case do not require him Ato guess the reason or reasons that the judge has ruled against@ him. *See Roberts*, 999 S.W.2d at 437. We overrule the fourth issue on appeal.

## **Conclusion**

Having overruled all the issues raised, we affirm the trial court=s judgment.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed: March 20, 2003

**14**