**Opinion filed April 29, 2016**



## In The

# Eleventh Court of Appeals

_____

## No. 11-12-00295-CV

_____

## CHARLES EDWARD ROBINSON, Appellant

## V.

## AUSTIN WILEY GARCIA, Appellee

**On Appeal from the 12th District Court**
**Walker County, Texas**
**Trial Court Cause No. 24732**

## M E M O R A N D U M   O P I N I O N

This court's former opinion and judgment dated July 9, 2015, are withdrawn. This court's opinion and judgment dated April 29, 2016, are substituted therefor. The motion for partial rehearing filed by Charles Edward Robinson is denied, and the motion for rehearing filed by Austin Wiley Garcia is also denied.

Austin Wiley Garcia sued Charles Edward Robinson, Appellant; John S. Robinson, Appellant's father; and Sherry Ann Eaton for negligence in connection

with a three-vehicle collision. Garcia nonsuited Appellant's father, and the trial court granted Eaton's summary judgment motion and severed her from this case. At trial, the jury awarded Garcia $1,241,823.83 in damages. The trial court entered a final judgment in accordance with the jury's verdict. Appellant asserts six issues on appeal. We reverse and remand for a new trial.

## I. *Procedural History*

The week before trial, Appellant filed a motion to recuse the trial judge. The trial judge referred the motion to the presiding judge of the administrative region. The presiding judge denied the motion without a hearing, and the case proceeded to trial.

Also prior to trial, the trial court entered an order in relation to a motion in limine that Garcia had filed. In the order, the trial court indicated that certain items of evidence were not going to be admitted at the trial. During the trial, Appellant made offers of proof as to those items of evidence. The trial court responded to the offers of proof with a comment that it did not intend to change any pretrial rulings, and it did not allow the items into evidence during the trial.

## II. *Evidence at Trial*

Garcia worked for Rent-A-Center (RAC) as a customer account representative. As a part of his job, Garcia took care of customer accounts and delivered furniture, which involved driving a big box truck and lifting heavy objects.

While on a delivery assignment for RAC, Garcia stopped at an intersection behind a pickup pulling a trailer. Eaton stopped her Chevrolet Lumina behind Garcia. While the vehicles were thus positioned, Appellant drove his pickup into the back of Eaton's car and pushed it underneath the back of the RAC box truck being driven by Garcia. The box truck moved forward a couple of feet but did not strike the pickup or trailer in front of it; Garcia said that he had his foot on the brake.

Garcia testified that he put the box truck in park, got out, and spoke to Eaton and Appellant; everyone said that they were okay. Trooper Douglas Ray Masters arrived at the scene about forty-five minutes later, and no one reported any injuries to him. Garcia told Trooper Masters that he was "perfectly okay." Garcia drove to his last delivery location for that day and delivered a dryer. He then returned to the RAC office to complete paperwork about the accident.

Garcia testified that, later that night, he began to feel stiffness in his neck and lower back. Garcia also said that he had a radiating pain and a tingling sensation down his right leg. The stiffness and pain interrupted his sleep and made it difficult for him to walk or sit for long periods of time; he had to have his girlfriend help him from his bed. But Garcia did not go to the emergency room at any time after the accident and did not go see any medical personnel about his pain until several days after the accident. He did, however, report to work.

Garcia went to see Dr. Peck, a chiropractor, who put Garcia on a work restriction, and he was not to lift more than ten pounds. Later, Garcia met with other chiropractors and orthopedic surgeons, including a specialist in treating neck pain. Garcia received massage therapy, heat therapy, ultrasound therapy, and physical therapy. He also learned exercises that would help to strengthen his core.

Over the course of time that Garcia saw medical professionals, he had multiple MRIs of his neck and of his back. Garcia received prescription pain medication, muscle relaxers, and sleeping pills. Doctors gave Garcia several steroid injections in his back and one in his neck. Approximately seven months after the accident, Dr. David W. Strausser performed surgery on Garcia's back, but the surgery did not alleviate Garcia's pain. Sometime later, Garcia began to use a cane.

Appellant's expert witness, Dr. Richard A. Suss, opined that Garcia should not have had back surgery. Dr. Strausser and Dr. Stephen Michael Sims, both of whom treated Garcia, opined that Garcia would most likely continue to have pain in

3

the future. Dr. Sims also opined that Garcia would continue to take pain medication and receive injections but that, if those were not successful, he could get a spinal cord stimulator and, if that did not work, could have surgery in the future. Dr. Strausser opined that Garcia might have another surgery.

Garcia testified that he would have continued to work at RAC but that he had a work restriction and could not do any heavy lifting. Garcia continued to work at RAC for six weeks after the accident, but he testified that he could not perform his normal daily activities. Although Garcia worked more overtime hours before the accident, he continued to work overtime hours after the accident. In December 2007, RAC terminated Garcia's employment when he did not complete and return documents that would have kept him on indefinite unpaid leave.

Sometime after his surgery, Garcia got a job at a Pilot Travel Center; he worked at a Wendy's Restaurant that was located in the travel center. A short time later, he got a job at a Radio Shack, which paid less than what he had made at RAC. Garcia's economist, Dr. Thomas H. Mayor, testified as to Garcia's lost earning capacity in the past and future and opined about the present value cost of medical expenses incurred in the future.

Defense counsel questioned Garcia about the number of jobs he had held prior to the RAC job, but the trial court limited cross-examination to questions on length of employment and pay rates. Defense counsel also was not allowed to inquire about other information in Garcia's employment and Navy records even though the trial court allowed introduction of some of his Navy medical records.

The jury, after a four-day trial, found Appellant negligent and found that his negligence proximately caused the accident. The jury awarded Garcia $38,879.83 for past medical care expenses, $382,720 for future medical care expenses, $149,726 for past loss of earning capacity, $465,498 for future loss of earning capacity, $50,000 for past physical pain, $150,000 for future physical pain, $5,000 for past

4

physical impairment, and nothing for future physical impairment. Appellant filed a motion for judgment notwithstanding the verdict, a motion for new trial, and an alternative motion for remittitur. The trial court denied all three motions.

## III. *Issues Presented*

Appellant first challenges the trial court's exclusion of certain evidence. In his second issue, Appellant challenges the jury charge. In his third issue, Appellant argues that the trial court erred when it denied his motion for new trial in which Appellant alleged incurable jury argument. In his fourth issue, Appellant challenges, on legal and factual sufficiency grounds, the jury's finding of future medical expenses. In his fifth issue, Appellant asserts that the evidence to support the jury's findings of loss of both past and future earning capacity is legally and factually insufficient. Appellant's sixth issue is that the trial court erred when it denied his motion to recuse.

## IV. *Analysis*

Because legal sufficiency points require a reversal and rendition, if sustained, we will discuss those issues first. We will next address two of Appellant's challenges to the exclusion of evidence and then address his final issue on the denial by the trial court of his motion to recuse.

### A. *Standard of Review*

In a legal sufficiency review, we review the evidence in a light that tends to support the disputed finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). We "assess all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in favor of the judgment." *City of Austin Police Dep't v. Brown*, 96 S.W.3d 588, 593 (Tex. App.—Austin 2002, pet. dism'd) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)).

5

The no-evidence challenge must fail if more than a scintilla of evidence supports the challenged finding. *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999). We may only sustain a legal sufficiency challenge when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the sole evidence offered to prove a vital fact, (3) the sole evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)).

B. *Issue Four: Future Medical Expenses*

Appellant complains that "no evidence" or factually insufficient evidence was adduced at trial to support the jury's finding of future medical expenses. We require no precise evidence for a finding of future medical expenses but will uphold the jury's finding as long as more than a scintilla of probative evidence supports it.[1] *Strahan v. Davis*, 872 S.W.2d 828, 832–33 (Tex. App.—Waco 1994, writ denied). "Testimony of a 'reasonable medical probability' by a medical expert is not a prerequisite to a recovery for future medical expenses." *Id.* at 832 (citing *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.)). Thus, a plaintiff may testify as to his own physical health. *See City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex. App.—San Antonio 1988, writ denied).

Texas follows the "reasonable probability rule" for future damages for personal injuries. *Doctor v. Pardue*, 186 S.W.3d 4, 20 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (citing *Rosenboom Mach. & Tool, Inc. v. Machala*, 995

---

[1]Under a docket equalization order, the Supreme Court of Texas transferred this appeal from the Tenth Court of Appeals to the Eleventh Court of Appeals. Under Rule 41.3 of the Texas Rules of Appellate Procedure, we apply the precedent of the Tenth Court of Appeals unless it appears that the Tenth Court of Appeals would not be bound by that precedent. TEX. R. APP. P. 41.3.

S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). "Thus, to recover future medical expenses, a plaintiff must show that there is a reasonable probability that expenses resulting from the injury will be necessary in the future and the reasonable costs of such care." *Id.* The jury may determine reasonable probability "by consideration of the substance of the testimony . . . and . . . not . . . on semantics or on the use by [a] witness of any particular term or phrase." *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966). We consider the immediacy of treatment of the plaintiff following the alleged cause of the injury, the breadth and scope of past treatment received for the injury and the success of that treatment, the plaintiff's testimony about his injuries, his incurred medical expenses, his medical condition at trial, his future prognosis, and any testimony on maximum medical improvement. *Blankenship v. Mirick*, 984 S.W.2d 771, 778–79 (Tex. App.—Waco 1999, pet. denied); *see also Strahan*, 872 S.W.2d at 833.

The Waco court has held that the absence of medical expert testimony on future medical expenses does not in and of itself result in legal or factual insufficiency. *Blakenship*, 984 S.W.2d at 778; *Strahan*, 872 S.W.2d at 832. The Amarillo Court of Appeals and the San Antonio Court of Appeals agree with the proposition applied by the Waco court. *See Vela*, 762 S.W.2d at 320–21; *Hughett*, 624 S.W.2d at 405–06. Contrary to the argument put forth by Appellant, the Dallas Court of Appeals has not held otherwise. In *Thate*, the Dallas court opined that the *preferred* way to prove future medical expenses was through medical professional testimony about the kind of services required in the future and the reasonable value of those services. *Thate v. Tex. & Pac. Ry. Co.*, 595 S.W.2d 591, 601 (Tex. Civ. App.—Dallas 1980, writ dism'd); *see also Matbon, Inc. v. Gries*, 288 S.W.3d 471, 485 (Tex. App.—Eastland 2009, no pet.); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 422 (Tex. App.—Eastland 2006, no pet.). However, the *Thate* court did not take the position that such testimony was *required*. *Thate*, 595 S.W.2d at 601.

7

Rather, the court stated that the only *requirement* was that there be evidence in the record as to the reasonable value of past medical services as well as to the probable necessity of future medical treatment. *Id.*

Jury Question No. 2b asked the jury to determine "[m]edical care expenses that, in reasonable probability, . . . Garcia will incur in the future." Both Dr. Strausser and Dr. Sims testified that they would base their answers on reasonable medical probability. Dr. Strausser testified that Garcia's lower back pain would "most likely" continue in the future. Dr. Strausser performed the first surgery, which did not resolve Garcia's pain, but Dr. Strausser did not testify that Garcia *would* have a future surgery, only that he *might* have a fusion surgery.

Dr. Sims said that he relied on Garcia's history and integrity for his belief that Garcia would have "chronic pain for the rest of his life." Dr. Sims testified that he "would predict [Garcia] would have definitely *some sort of treatment* in the future; and [the chronic pain management, spinal cord stimulator implant, and fusion surgery were included in the] range of what that *could be*." Dr. Sims told Garcia that Garcia was a candidate for a dorsal pain stimulator implant *if* continued steroid injections did not alleviate the pain. Dr. Sims also testified that his plan for Garcia included a fusion surgery *if* he did not respond well to pain medication, injections, and the stimulator treatment. Dr. Sims testified that the cost for chronic pain management for Garcia, *if* Garcia filled his prescription and got three injections a year, was on the higher end of the $2,000 to $10,000 range. Dr. Sims also testified that, if those treatments failed to alleviate Garcia's pain, a low estimate for the dorsal pain stimulator implant would be between $30,000 and $40,000 and that a fusion surgery would cost between $50,000 and $100,000.

Dr. Mayor testified that Garcia's life expectancy was 79.5 years "based on U.S. Government statistics." Garcia was thirty years old at the time of trial. If Garcia were to spend $10,000 a year, as the high end of his chronic pain management

8

treatment, from the time of trial to the end of his life, the total would be $465,440, according to Dr. Mayor's present value table. The jury's award of $382,720 for future medical expenses falls within the range outlined by Dr. Sims. All of this evidence was some evidence of future medical expenses and is, therefore, legally sufficient. Because we are reversing and remanding this case on admissibility-of-evidence issues, we need not address whether the evidence was factually sufficient to support the award of future medical expenses. We overrule Issue Four insofar as it claims that the evidence was legally insufficient to support the jury's findings as to loss of future medical expenses.

### C. Issue Five: Loss of Past and Future Earning Capacity

The amount a plaintiff can recover for loss of earning capacity is the difference between the amount of money he was capable of earning before the injury, not what he actually earned, and the amount he is capable of earning after the injury. *Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 120 (Tex. App.—Texarkana 2006, pet. denied) (citing *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943)); *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 903 (Tex. App.—Texarkana 2004, pet. denied).

### 1. Assessment of Past and Future Earning Capacity

The factfinder measures earning capacity by "what the worker's capacity to earn a livelihood actually was, even if he or she had never worked in that capacity in the past." *Cernat*, 205 S.W.3d at 120. The plaintiff must show his capacity to work before the injury, an impairment caused by the injury, and the extent of the loss of capacity resulting from the impairment. *See Smoak*, 134 S.W.3d at 903; *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 36 (Tex. App.—Tyler 2003, pet. denied) (citing *Decker v. Latham*, 446 S.W.2d 113, 116 (Tex. Civ. App.—El Paso 1969, writ ref'd n.r.e.)).

Post-injury earnings are always uncertain, however, "and must be left largely to the sound judgment and discretion of the jury. . . . If plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury." *McIver*, 169 S.W.2d at 712. The plaintiff "must prove the amount of such damages with the degree of certainty to which it is susceptible." *Bonney v. San Antonio Transit Co.*, 325 S.W.2d 117, 121 (Tex. 1959). "[T]he jury should not be left to mere conjecture where facts appear to be available upon which the jury could base an intelligent answer." *Id.* The plaintiff, for example, must ordinarily show the amount of his fixed pay rate or salary if he received one. *McIver*, 169 S.W.2d at 712. The jury must use its "common knowledge and experience and sense of justice" to determine lost earning capacity. *Id.* at 713.

### 2. *Loss of Earning Capacity in the Past*

The jury awarded Garcia $149,726 for "[l]oss of earning capacity sustained in the past." Garcia was employed at RAC at the time of the accident. Garcia adduced evidence that he had worked at RAC before the accident and had suffered an injury and was impaired as a result of the accident; he also provided evidence of his actual earnings before and after the accident. *See Smoak*, 134 S.W.3d at 903; *Plainview Motels*, 127 S.W.3d at 36. Garcia presented payroll records from the jobs he held from the time of his accident to the time of trial. The payroll records showed that Garcia's current earnings at Radio Shack were about forty-five percent less than what he could earn at RAC.

These records and Dr. Mayor's testimony show that, based on Garcia's pay rate, average hours worked, and fringe benefits, Garcia could have made $179,628 from the time of the accident until trial if he had remained at RAC. Garcia actually made, from the time of the accident to the time of trial, a total of $29,902. What

10

Garcia could have made over this period, had he stayed at RAC, minus what he actually made equals $149,726.

The court in *Smoak* held that the economic expert did not err by basing the plaintiff's earning capacity on six weeks of work as a welder because the plaintiff said that he was able to perform as a welder before the accident but not after the accident. *Smoak*, 134 S.W.3d 900–01. Garcia, similarly, was only working at RAC for a short time before the accident. Garcia asserted that he could not continue to work at RAC. Dr. Strausser testified that he did not release Garcia to return to RAC after the accident. Defense counsel argued that Garcia's work history did not support a finding that Garcia would have continued to work at RAC long term. Although Garcia said that he had no plans to ever leave the job and wanted to keep it "[a]s long as possible," defense counsel argued that Garcia had held most of his jobs for only a few months and had never held a job anywhere for more than two years.

The jury knew of Garcia's capacity to work both before and after the accident; his sporadic, short-term work history before his RAC job; and his pay rate at RAC as compared to his other jobs. *See Bonney*, 325 S.W.2d at 121. Again, defense counsel asserted that Garcia's employment history did not reflect that he would hold any job for a significant period of time; the jury chose to believe Garcia. We hold that legally sufficient evidence was adduced at trial to support the jury's award of $149,726 in lost earning capacity in the past.

### 3. Loss of Earning Capacity in the Future

The jury awarded Garcia $465,498 for "[l]oss of earning capacity that, in reasonable probability, . . . Garcia will sustain in the future." Garcia testified that the RAC job was the best job he had ever had. The job required heavy lifting, and Garcia showed that, after the accident, he was on a work restriction from heavy lifting.

11

Garcia showed that he had worked at RAC before the accident and that an injury occurred as a result of the accident; he also provided evidence of his actual earnings before and after the accident. *See Smoak*, 134 S.W.3d at 903; *Plainview Motels*, 127 S.W.3d at 36. Garcia submitted payroll records from Radio Shack, which showed that Garcia's current earnings were about forty-five percent less than what he could earn at RAC.

Dr. Mayor predicted Garcia's work-life expectancy, from the time of the accident, to be an additional 34.2 years based on general statistical information provided by the government. Dr. Mayor's table shows the present value calculation of Garcia's earnings from the time of trial through the end of his work-life expectancy. Garcia's total lost wages, if the accident had completely incapacitated him from the time of trial to the end of his expected work life, would be $1,034,441, and forty-five percent of that would be $465,498. Unlike *Bonney*, evidence of Garcia's "earnings or a monetary measure of his earning capacity prior to the injury" exists in the form of his payroll records from RAC. *See Bonney*, 325 S.W.2d at 121. And unlike *Millett*, Dr. Mayor did not "hypothesize how much [Garcia] could have earned had he [had another job that paid more money]." *See Loyd Elec. Co. v. Millett*, 767 S.W.2d 476, 483 (Tex. App.—San Antonio 1989, no writ). More than a scintilla of evidence supports the jury's finding on future loss of earning capacity. Because we are reversing and remanding this case on admissibility-of-evidence issues, we need not address whether the evidence was factually sufficient to support the award of either past or future loss of earning capacity. We overrule Issue Five insofar as it claims that the evidence was legally insufficient to support the jury's findings as to loss of past and future earning capacity.

*D. Issue One: Exclusion of Evidence*

Although there are several evidentiary issues that Appellant questions in his first issue, we will address only two of them. Those two instances deal with (1) the

12

exclusion of some of Garcia's Navy documents and employment history records and (2) the exclusion of some of Dr. Strausser's testimony.

### 1. Standard of Review

We review Appellant's evidentiary complaints under an abuse of discretion standard. *See Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We will reverse only if the trial court's decision constituted an abuse of discretion and if harm occurred and probably resulted in an improper judgment. TEX. R. APP. P. 44.1(a); *see Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003); *Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex. 1995). We review the entire record to determine whether an error is harmful. *Interstate Northborough*, 66 S.W.3d at 220.

### 2. Garcia's Navy Documents and Other Employment Records

Appellant challenges the trial court's exclusion of some of Garcia's Navy records. He also challenges the exclusion of some of Garcia's work history and employee evaluation information from Garcia's jobs at Jack in the Box, Landmark Industries, and other places. Appellant attempted to use this evidence to impeach Garcia's credibility. The trial court refused to admit evidence from Garcia's Navy records, except specific Navy medical records, and refused to allow cross-examination of Garcia on the alleged, "unadjudicated" reasons why he left the Navy or why he was terminated from other civilian employment.

Garcia argues on appeal and in his motion for rehearing that the evidence from his Navy service and other civilian employment is inadmissible character evidence

under the Texas Rules of Evidence.[2]   At trial, Garcia argued extreme prejudice, under Rule 403, because the evidence would create a "trial within a trial."   On appeal and in his motion for rehearing, Garcia argued additionally that Rules 608 and 609 required the trial court to exclude the "unadjudicated" reasons why Garcia left certain employment.   The issue before us is whether Garcia's trial testimony provided Appellant with the opportunity to impeach Garcia.

Impeachment was the primary purpose for which Appellant sought to use evidence of Garcia's Navy and employment records.   Generally, a party is not entitled to impeach a witness on a collateral matter.   *Floyd v. Fid. Union Cas. Co.*, 39 S.W.2d 1091, 1093 (Tex. Comm'n App. 1931).   Evidence that may otherwise be inadmissible, however, may become admissible when a party creates a false or misleading impression with the jury.   *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007).   Such evidence invites the other side to respond to correct the misleading impression.   *Caffe Ribs, Inc. v. State*, No. 14-0193, 2016 WL 1267677, at *6 (Tex. Apr. 11, 2016) (where State exploited exclusion of evidence and left impression with jury that a party was not committed to environmental cleanup of a property, that party was allowed to introduce evidence that delay in cleanup was partly the result of a State-imposed project).

A party may also be impeached by showing statements made by him that are contradictory or inconsistent with his testimony given in the pending case.   *Huff v. Harrell*, 941 S.W.2d 230, 239 (Tex. App.—Corpus Christi 1996, writ denied) (citing *Westchester Fire Ins. Co. v. Lowe*, 888 S.W.2d 243, 252 (Tex. App.—Beaumont 1994, no writ)).   "The general theory of impeachment by proof of a prior inconsistent statement by the same witness is to show that he has a capacity for making errors."

---

[2]Garcia also argued that Rule 404(b) was applicable and precluded admission of the evidence. Rule 404(b) provides in part that evidence of prior bad acts is generally not admissible to show conformity with the acts alleged in the present case, but such evidence may be admissible for another enumerated purpose.   TEX. R. EVID. 404(b).

14

*Cirilo v. Cook Paint & Varnish Co.*, 476 S.W.2d 742, 748 (Tex. Civ. App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.). From his error in one matter, it may be inferred that he has erred on other matters. *Id.* And if a previous statement and present testimony cannot both be true, such as when they are contradictory, then one of them must be erroneous. *Id.* Prior inconsistent statements contained in depositions are admissible in evidence to impeach a witness. *Spring Branch Bank v. Wright*, 404 S.W.2d 659, 664 (Tex. Civ. App.—Houston 1966, writ ref'd n.r.e.). "The statements must be inconsistent in fact and directed to the same occasion." *Id.*

Garcia testified in his deposition that it was a "mutual agreement" between the Navy and him for him to leave the service. In his deposition, Garcia represented that there were no "charges" and that there was nothing on his discharge documents to indicate that his discharge was "other than honorable." Garcia also testified in his deposition that he did not "agree with things" and did not "want to be in the Navy." He also represented that he had gotten into trouble for "underage drinking" and for "unauthorized absence" but that it was just "rowdy stuff"; he denied that he had been "kicked out." When asked if there was anything else, he testified, under oath, "No, sir." In response to a pretrial motion, the trial court limited the scope of cross-examination on Garcia's Navy records on these matters.

At trial, Garcia answered "yes" when asked to confirm that he "didn't like" the Navy and "eventually mustered out of the Navy" after two years.[3] He answered "yes" when asked if he "*chose* to leave the Navy" (emphasis added). When asked if he "did . . . things" while he was "in the Navy" that he was "[not] proud of," Garcia answered, "Yes." He also answered "yes" when asked if he agreed that he was not "very mature," but he did not agree that he failed to act as a "mature young man

---

[3]Garcia's Navy records indicated that, although he had completed mess management training, had a "secret" security clearance, and had served for five and one-half months on the USS *Tennessee*, an Ohio-class ballistic missile submarine, he ultimately only served a total of one year and nine months of his five-year enlistment.

should act" in the Navy. When asked, "Bottom line is: After being in the Navy for awhile you decided, I need to get out of here and go do something else," Garcia answered, "Yes."

Garcia did not testify at trial that his separation and discharge was by "mutual agreement"; he also never mentioned his drinking or unauthorized absence. In his deposition, he testified that there were no "other" charges and that he was not "kicked out." But he omitted, both in his deposition and at trial, that his Navy records indicated that he had pleaded guilty to larceny, that he had pleaded guilty to breaking restriction, and that he had been discharged for "other than honorable conditions" with "no potential for future service." Appellant made an offer of proof regarding the testimony he sought to introduce on cross-examination, but the trial court did not allow the admission of the impeachment evidence from either Garcia's deposition testimony or Navy records about Garcia's separation and discharge from the Navy.

Appellant argued that Garcia's misleading testimony put Garcia's service, separation, and discharge at issue. Navy records indicated that Garcia was separated under other than honorable conditions for misconduct for unauthorized absence and breaking restriction, as determined at a summary court martial where he pleaded guilty to all charges. *See* 10 U.S.C. § 886, art. 86 (absence without leave), § 934, art. 134 (general article).[4] The summary court martial charges arose from Garcia's pattern of misconduct, which included "underage" drinking and the commission of a serious offense: "larceny and wrongful appropriation," a crime of moral turpitude.[5] Garcia's Navy records reflected that he had admitted his guilt to all offenses against

[4]Garcia's summary court martial punishment was thirty days' confinement.

[5]Garcia's nonjudicial punishment for the larceny was forty-five days of restriction and forty-five days of extra duties with a reduction in rank and pay grade and forfeiture of one-half of one month's pay for two months.

16

military justice, including the larceny, and had admitted that his conduct reflected a pattern of misconduct and the commission of a "serious" offense.[6]

Appellant argued that Garcia's trial testimony left a misleading impression about his wrongdoing in the Navy, which included admissions of a serious offense. He also left a misleading impression about the overall character of his service and discharge. Garcia's Navy records also do not mention a "mutual agreement" for separation. Appellant argued that these separation and discharge matters became an issue when Garcia represented at trial that he "*chose to leave* the Navy"; Appellant argued that Garcia's records indicated that he was required to end his enlistment early. His trial testimony created issues about his credibility, and Appellant should have been allowed to cross-examine and impeach him with the differences, contradictions, or errors in his testimony. *See Cirilo*, 476 S.W.2d at 748; *Spring Branch Bank*, 404 S.W.2d at 664.

The trial court, in pretrial, also limited the scope of cross-examination about Garcia's civilian employment. When asked to confirm that he wanted to pursue his interest as a "cook" after his discharge from the Navy, Garcia answered, "Yes." Garcia was initially trained as a Navy mess specialist or cook; he said the job's name was later changed to "culinary specialist." But his last assignment before discharge was simply manual labor.[7] Garcia said that, after the Navy, he went "mostly with food" because that was what he "was trained to do, so it was easier" and was what he "knew how to do." He said, "I was promoted to management at a lot of restaurants." He said, "I started realizing I could *manage* because I had skills from the military" (emphasis added).

---

[6]Garcia's Navy records also indicated that Garcia waived all rights to the administrative discharge, including the right to counsel and the right to an administrative board hearing, and that he did not appeal.

[7]Garcia's Navy records indicated that he was removed from submarine service and placed in an administrative post where he did manual labor before he was administratively discharged.

17

Garcia worked many jobs, both in and out of food service, and was unemployed for several months during the fifty-five month period from his Navy discharge to his RAC employment. When asked about his frequent job changes, Garcia answered that there is "a really high turnover rate when it comes to restaurants," and he also said that "[m]ost of the time it's you figure out the job is not worth what you're getting paid." When asked if he changed jobs after six months to "[m]ove on to something else," he said, "That's correct."

But, as to at least two of the jobs Garcia held after the Navy, Appellant argued that the evidence indicated that the reason for Garcia's departure was different than the reason he testified to, which was to "move on to something else" because "most of the time it's you figure out the job is not worth what you're getting paid." Garcia actually worked at one job, at Jack in the Box, where he was a shift supervisor and made $7.00 an hour. But his next job was at a Shell station, "Landmark Industries, Ltd.," where he was a "walk-in" hire who worked as a cashier, and he made less, $6.50 an hour. Garcia, in his deposition, represented that he was fired for asking too many questions at Jack in the Box, and Garcia claimed that the manager was "the thief." Garcia's Jack in the Box records indicated that he was terminated because *he closed the store early without authorization*. The Landmark records indicated that he was terminated because he was accused of *theft of store merchandise*, which was an accusation of misconduct similar to the misconduct that he had committed in the Navy.

Garcia's ability to work long term at RAC was an issue at trial.[8] Garcia asserted at trial that he had management skills from the military. But Appellant was not allowed to cross-examine him on his last evaluation report in the Navy. In that

---

[8]Garcia's RAC job, as a customer account representative, included heavy lifting. Garcia's Navy entrance physical and medical history were admitted as evidence of good health and to show the lack of health issues that he alleged arose after the accident.

report, Garcia's rater, D.L. Taylor, evaluated Garcia's performance in a manual labor job. Taylor reported that Garcia was a "1.0" on a 1.0–5.0 scale (5.0 being the highest rating and 1.0 being "[b]elow [s]tandards") because Garcia *needed excessive supervision*. Taylor also reported that Garcia:

(1) failed to understand team goals and was wasteful of resources;

(2) failed to take direction well and his work product often needed rework;

(3) prioritized poorly and *avoided responsibility*;

(4) failed to value differences from cultural diversity;

(5) had poor self-control;

(6) was unwilling to work with others and created conflict;

(7) had a consistent unsatisfactory appearance;

(8) *was unable to meet one or more physical readiness standards*;

(9) acted in a way counter to good order and Navy retention; and

(10) *failed to live up to one or more of the Navy's Core Values* of Honor, Courage, and *Commitment*.

In addition, Garcia represented at trial that he had no plans to ever leave his job at RAC because he "loved" the job and it was the "best job [he] ever had." However, RAC records indicated that he was on RAC's *"COMMIT!"* plan.[9] He was on the *"COMMIT!"* plan because he had been late for work several times and had shown up seventy-three minutes late for work without authorization—issues that were similar to issues he had during his Navy service and other civilian employment. These facts stand in contrast to Garcia's representation at trial that he "could *manage* because [he] had skills from the military" (emphasis added).

Garcia argued that the evidence was properly excluded because it was collateral and "extremely prejudic[ial]." "A party can make otherwise irrelevant

_____

[9]Garcia's *"COMMIT!"* plan warned that further tardiness could result in his termination.

19

evidence relevant by injecting collateral issues into a lawsuit." *Bay Area Healthcare*, 239 S.W.3d at 234 (quoting W. JEREMY COUNSELLER & CHARLES D. BROWN, HANDBOOK OF TEXAS EVIDENCE § 401.03 (2005)). Garcia injected collateral issues into the case with his misleading testimony. The impeachment evidence that Appellant wanted to introduce was certainly prejudicial; this type of evidence always is prejudicial. However, Rule 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403.

Garcia's trial testimony differed from the testimony that he gave in his deposition and also contradicted evidence contained in his Navy and other employment records. Garcia also was the only witness that testified about his potential longevity at RAC. *See Border Apparel-E., Inc. v. Guadian*, 868 S.W.2d 894, 898 (Tex. App.—El Paso 1993, no writ) (work performance and prospects for promotion are factors in determining lost earning capacity). Garcia's credibility was a critical issue, and he testified about his desire and ability to work at RAC—the job that he described as the "best job [he] ever had," a job he "loved," and the job that he had no plans to ever leave. The impeachment evidence that Appellant sought to use was highly probative and was not unfairly prejudicial or confusing; it also was not cumulative of other evidence. Appellant sought to impeach Garcia's trial testimony where it differed from Garcia's deposition or from his Navy or civilian employment records. Because Garcia's trial testimony created those issues, Appellant should have been allowed to use Garcia's deposition testimony and his Navy and civilian employment records to impeach him with these differences, contradictions, or errors. *See Cirilo*, 476 S.W.2d at 748; *Spring Branch Bank*, 404 S.W.2d at 664. The trial court abused its discretion when it did not allow Appellant to cross-examine Garcia after Garcia gave misleading testimony at trial.

20

### 3. *Exclusion of Dr. Strausser's Testimony*

Appellant also challenges the trial court's exclusion of portions of Dr. Strausser's deposition in which Dr. Strausser was confronted with facts that Garcia had not told him when Garcia related his medical and work history to Dr. Strausser. For instance, Garcia had not told the doctor about a prior automobile collision in which he was involved. On that occasion, Garcia drove his vehicle into a horse. His mother was riding with him and was injured. She ultimately sued him for those injuries. Additionally, Garcia did not tell Dr. Strausser that he continued to move and deliver furniture after the accident made the basis of this suit.

Although the jury heard that Garcia delivered furniture for RAC after the accident, the jury was not able to hear the opinion that Dr. Strausser gave in his deposition that the prior accident with the horse or the work duties following the RAC accident may have been the cause of the disc herniation. Garcia conceded that Dr. Strausser's records showed that the disc herniation, which Garcia alleged was caused by the RAC accident, did not actually occur at the time of the accident in this case. Reasonable probability is determined by the substance and context of the opinion and does not turn on semantics or on the use of a particular term or phrase. *Schaefer v. Tex. Emp'rs' Ins. Ass'n*, 612 S.W.2d 199, 202 (Tex. 1980). Dr. Strausser testified that all his answers would be given based upon a reasonable degree of medical probability. Appellant made an offer of proof to admit this evidence, which was denied by the trial court. Dr. Strausser's testimony should have been allowed at trial as part of Appellant's cross-examination of Dr. Strausser.

We hold that the trial court abused its discretion when it excluded this evidence. If evidence presents "other plausible causes of the injury or condition that *could* be negated, the [proponent of the testimony] *must* offer evidence excluding those causes with reasonable certainty." *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010) (alteration in original) (quoting *Merrell Dow Pharm., Inc. v.*

21

*Havner*, 953 S.W.2d 706, 720 (Tex. 1997)) (internal quotation marks omitted) (citing *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558–59 (Tex. 1995)). In the instant case, the opposite occurred. Dr. Strausser opined, in his deposition testimony,[10] that the RAC accident did not cause the herniation. When defense counsel apprised Dr. Strausser of the prior accident and Garcia's post-accident work duties, Dr. Strausser stated, in his deposition, that those could be possible causes of Garcia's disc herniation. The trial court did not allow the jury to hear that evidence. When it excluded the evidence, the trial court erred and abused its discretion.

### 4. Whether Trial Court's Exclusion of Evidence Requires Reversal

A person seeking to reverse a judgment based on evidentiary error need not prove that, but for the error, a different judgment would necessarily have been rendered, but need only prove that the error probably resulted in an improper judgment. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995) (citing *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992); *King v. Skelly*, 452 S.W.2d 691, 696 (Tex. 1970)). We review the entire record to see if the judgment turned on the excluded evidence. *Id.* at 754.

Only Garcia testified about his continued long-term, future employment at RAC. Garcia's trial testimony about his Navy service and discharge differed from his deposition testimony and his records. Garcia also gave reasons why he left certain civilian employment that were different from the reasons reflected in his deposition testimony and employment records. Appellant was not allowed to cross-examine Garcia about these differences or about his work habits at the job that he had held the longest: his twenty-one month Navy enlistment. The court in *Cameron*

---

[10]Dr. Strausser also noted in Garcia's medical records, which were admitted at trial, that the accident did not cause the disc herniation, but Dr. Strausser's responses to the "did you know questions" were excluded.

*Mill & Elevator Co. v. Anderson* stated that the jury should determine earning capacity based on whether "the plaintiff be afflicted in mind or body, or if he be indolent, drunken, and thriftless, the defendant ought to be permitted to prove the fact, so as to show that his earning capacity is not that of a person of ordinary endowments, mental or physical, and of *ordinary habits*." 81 S.W. 282, 283 (Tex. 1904) (emphasis added).

Evidence adduced at trial outlined that RAC had several requirements for the job that Garcia held, and those requirements included that Garcia had to follow instructions and all policies and procedures and adhere to all standards. But Garcia was on probation and under a *"COMMIT!"* plan at RAC for failure to adhere to attendance policies. Garcia's last Navy rater reported that Garcia *needed excessive* supervision, *avoided responsibility*, *was unable to meet one or more physical readiness standards*, and *failed to live up to* the Navy's core value of *commitment*. The jury was unaware of this evidence. Appellant should have been allowed to present the excluded impeachment evidence when Garcia's trial testimony put these matters at issue. Had Appellant been allowed to cross-examine and impeach Garcia, the excluded evidence would have cast substantial doubt not only on Garcia's credibility, but also on his capacity for duration, consistency, and efficiency of work at RAC, which involved heavy lifting and which he asserted would have continued, *uninterrupted*, into the future because he had no plans to ever leave the job he "loved," the "best job [he] ever had."

In addition, the exclusion of Dr. Strausser's testimony about other possible causes for the disc herniation, which Garcia alleged was the source of his pain and the medical problem that led to his back surgery, was likewise not only erroneous but harmful. *See JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015) (defendant entitled to present evidence of a second accident as alternate cause to rebut plaintiff's claims of injury from first accident). In *JLG Trucking*, the Texas

23

Supreme Court held that the defendant was entitled to present evidence of the second accident to the jury, which was relevant to the plaintiff's theory of causation. *Id.* Here, Appellant should have been allowed to present Dr. Strausser's testimony, which cast doubt on the accident in this case as the cause of the disc herniation, and should have been allowed to rebut Garcia's assertions with evidence of the first accident as an alternate cause of Garcia's injuries. After a review of the entire record, we hold that the exclusion of evidence probably resulted in an improper judgment. We sustain that part of Appellant's first issue in which he claims that the trial court reversibly erred when it refused to admit the proffered testimony about the Navy records and civilian employment records and the testimony from Dr. Strausser about other causes for the disc herniation, including the first accident.

### E. Issue Six: Motion to Recuse

Appellant asserts, in his sixth issue, that the trial court abused its discretion when it denied his motion to recuse because the motion failed to meet the requirements of Rule 18a and Rule 18b. We review the denial of a motion to recuse under an abuse of discretion standard. TEX. R. CIV. P. 18a(j)(1)(A). A motion to recuse must "assert one or more of the grounds listed in Rule 18b" and must "state with detail and particularity facts that: (A) are within the affiant's personal knowledge, [or] on information and belief if the basis for that belief is specifically stated; (B) would be admissible in evidence; and (C) if proven, would be sufficient to justify recusal or disqualification." TEX. R. CIV. P. 18a(a)(2), (4). Grounds for recusal include reasonably questioned impartiality of the judge and personal bias or prejudice of the judge concerning the subject matter or a party. TEX. R. CIV. P. 18b(b)(1), (2). The responding judge must then recuse himself or refer the motion to the regional presiding judge. TEX. R. CIV. P. 18a(f). The regional presiding judge may summarily deny the motion without a hearing if the motion does not comply with Rule 18a. TEX. R. CIV. P. 18a(g)(3).

24

Appellant complained in his motion to recuse that the trial judge ruled against Appellant several times at a pretrial hearing and subsequently made the statement that, "when I was a real lawyer, Farmers [Insurance] could be counted on to make a fair offer." He also argues that a letter from Garcia's counsel supports his argument. Appellant acknowledged in his motion that the trial judge knew both that Farmers was the insurance company involved and that the matter had not been successfully resolved at mediation before he made his statement.

But Appellant produced no evidence that the trial judge knew of the settlement offer amounts. The trial judge also did not say that the offer at mediation was fair or unfair; he only related his past experience. Thus, his statement did not show partiality or a bias for or against any party or subject matter. His statement follows Texas policy to encourage parties to resolve their issues without litigation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 154.002 (West 2011) ("It is the policy of this state to encourage the peaceable resolution of disputes."); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997) ("Texas law favors and encourages voluntary settlements and orderly dispute resolution."). The trial judge's statement was not sufficient to justify recusal or disqualification. We hold that the regional presiding judge did not abuse his discretion when he denied the motion to recuse without a hearing because, even if Appellant's allegations had been presented at a hearing, those allegations would not have justified recusal. Issue Six is overruled.

## V. *Conclusion*

After a review of the record, we hold that the trial court abused its discretion when it prohibited the admission of evidence about Garcia's Navy service and other employment history, as well as the complained-of portions of Dr. Strausser's deposition. We also hold that the trial court's refusal to admit those items of evidence resulted in harmful error. To that extent, Issue One is sustained, and we need not address the remainder of the matters raised in Issue One.

Because we are reversing and remanding on those evidentiary grounds, we need not address either Issue Two or Issue Three. We also hold that legally sufficient evidence supported the jury's award of future medical expenses, loss of earning capacity in the past, and loss of earning capacity in the future, and we overrule Issues Four and Five to that extent. Because we are remanding on other issues, we do not reach the factual sufficiency arguments in Issues Four and Five. Finally, Appellant's sixth issue is overruled.

## VI. *This Court's Ruling*

We reverse the judgment of the trial court and remand this cause for a new trial.


MIKE WILLSON
JUSTICE


April 29, 2016

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.